**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JEANNA GODWIN, | |
| Plaintiff, | |
| v. | Case No. 2:22-cv-01066-PLD |
| THE GEORGE WASHINGTON, LP, | |
| Defendant. | |

**APPENDIX IN SUPPORT
OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant, The George Washington, LP ("Defendant"), by and through its undersigned counsel, respectfully submits this Appendix in Support of its Motion for Summary Judgment.

Date:   April 24, 2023

Respectfully submitted,

WHITEFORD TAYLOR & PRESTON, LLP

*/s/Anthony T. Gestrich*
Anthony T. Gestrich, Esquire
Pa. I.D. No. 325844
11 Stanwix Street, Suite 1400
Pittsburgh, PA  15222
T: 412-275-2400
F: 412-567-7564
agestrich@whitefordlaw.com

*Counsel for Defendant*

## INDEX

| Exhibit # | DESCRIPTION |
|---|---|
| 1 | Applicable pages of Transcript of Deposition of Defendant's employee/banquet manager, Caitlin Hutchison. |
| 2 | Defendant's production No. GW_0099 – List of all employees and dates of employment for applicable time period. |
| 3 | Applicable pages of Transcript of Deposition of Defendant's General Manager, Robert Plutto. |
| 4 | Applicable pages of Transcript of Deposition of Plaintiff, Jeanna Godwin. |
| 5 | Applicable pages of Transcript of Deposition of Timothy Paris, as Corporate Designee of Bull Pen Rustic Inn, LLC. |
| 6 | Applicable pages of Transcript of Deposition of Gena Hartman, as Corporate Designee of Hart's Restaurant and Lounge, Inc. |

# EXHIBIT 1

Applicable pages of Transcript of Deposition of Defendant's employee/banquet manager, Caitlin Hutchison.

# In the Matter Of:

*GODWIN vs*

*GEORGE WASHINGTON HOTEL*

## *CAITLIN HUTCHISON*

### *March 07, 2023*



## Page 1

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JEANNA GODWIN,                : JURY DEMANDED
     Plaintiff               :
                             : NO. 22-1099-PLD
          vs.                 :
                             :
GEORGE WASHINGTON HOTEL       :
CORPORATION,                  :
     Defendants              :

          Pittsburgh, Pennsylvania

          Tuesday, March 7, 2023

Virtual Deposition of:

          CAITLIN HUTCHISON,

          Called for oral examination by counsel for
the Plaintiff, pursuant to notice via Zoom technology,
before Melissa L. Clark, a Registered Professional
Reporter and Notary Public on behalf of Lexitas Legal,
beginning at 1:31 p.m., when were present on behalf
of the respective parties:

## Page 2

APPEARANCES:

     LAW OFFICES OF ERIC A. SHORE, P.C.
     BY:  GRAHAM F. BAIRD, ESQ.
     Two Penn Center
     1500 JFK Boulevard, #1240
     Philadelphia, Pennsylvania  19102
     (215) 627-9999
     grahamb@ericshore.com
          -- For the Plaintiff

     WHITEFORD, TAYLOR & PRESTON
     BY:  ANTHONY T. GESTRICH, ESQ.
     11 Stanwix Street
     Suite 1400
     Pittsburgh, Pennsylvania  15222
     (412) 275-2400
     agestrich@wtplaw.com
          -- For the Defendants


Also Present:  William Hutchison

          Vivi R. Besteman, Esq.

## Page 3

          INDEX TO WITNESSES

WITNESS                                    PAGE

CAITLIN HUTCHISON

     By Mr. Baird                              4

     By Mr. Gestrich                          30


          INDEX TO EXHIBITS

                                        PAGE
EXHIBIT     DESCRIPTION              MARKED


          (None offered.)

## Page 4

                    * * *

          P R O C E E D I N G S
                    * * *

          THE REPORTER:  The attorneys participating in this deposition acknowledge that I am not physically present in the deposition room and that I will be reporting this deposition remotely.

          They further acknowledge that in lieu of an oath administered in person, I will administer the oath remotely.

          The parties further agree that if the witness is testifying from a state where I am not a Notary, that the witness may be sworn in by an out-of-state Notary.

          If any party has an objection to this manner of reporting, please state so now.

          MR. BAIRD:  No objection.

          MR. GESTRICH:  No objection from our side.

          DIRECT EXAMINATION

BY MR. BAIRD:

     Q.    Good afternoon, Ms. Hutchison.  My name is Graham Baird, and I'm a lawyer and I represent Jeanna Godwin in a lawsuit that she's

Page 5

filed against the George Washington Hotel. Today we are here for your deposition.

Q. Can you state your full name for the record, please?

A. It's Caitlin Joy Hutchison.

Q. Okay. And that's Hutchison without an N; correct?

A. Correct.

Q. And Ms. Hutchison, have you ever been deposed before?

A. I have not.

Q. Okay. I'm going to give you some instructions to make this go as quickly and smoothly as possible.

I'm here to ask you questions about your knowledge surrounding the hiring interview process involving Jeanna Godwin. Your legal obligation is to provide answers to those questions to the best you can, and truthfully.

Do you understand that?

A. Yes.

Q. Okay. When I ask my questions, I would ask for you to please respond to them verbally. The court reporter, Ms. Clark, is taking down everything that is said by us, and

Page 6

it's very hard for her to take down non-verbal forms of communication, so please try to avoid shrugging your shoulder, nodding your head, nu-huh, uh-huh, things like that. I'll know what you mean -- we'll all know what you mean, but it won't show up clearly in the record.

Do you understand that?

A. Yes.

Q. Okay. Only one of us should talk at a time, so please wait for me to finish my complete question, and I will certainly give you the courtesy to wait until you fully answer before I ask another question, is that okay?

A. Yes.

Q. If you do not hear one of my questions, if you do not understand one of my questions, please tell me, and I will re-ask it or ask it in a more easily understandable way. If you answer the question, the Court is going to assume that you understood it.

Is that acceptable to you?

A. Yes.

Q. Okay. If you do not know, if you not remember, that is a perfectly acceptable answer. No one here wants you guessing about

Page 7

things, if you feel comfortable making an estimate as to, oh, well, that happened a couple weeks ago, that's totally fine, but just let us know that you're making an estimate, okay?

A. Okay.

Q. You can take a break whenever you want for whatever reason you want, just let me know, and we will take a break. If you -- if there is a question pending, you have to answer the question before we take a break, but otherwise, we can take as many breaks as you need to, although I do not expect this deposition to take very long.

Are you ready to begin?

A. Yes.

Q. Okay. Is there anyone else in the room with you?

A. Hutch, yes.

Q. Okay. And that is Mr. Hutchison; is that fair to say?

A. Yes.

Q. Is there anyone else in the room besides Mr. Hutchinson?

A. No.

Q. Okay. Have you ever filed a lawsuit

Page 8

against anyone?

A. No.

Q. Okay. What is your educational background?

A. I was home schooled from kindergarten to 12th Grade, and then I studied at Butler County Community College, and then transferred to Indiana University of Pennsylvania.

Q. Did you ever get a degree from Indiana University of Pennsylvania?

A. Yes, I have a Bachelor's of Science in Hospitality Management.

Q. Okay. And when did you get that degree?

A. I graduated in 2019.

Q. Okay. And what is your -- who do you work for?

A. The George Washington Hotel and Event venue.

Q. Okay. What is your job position there?

A. I'm the banquet manager.

Q. And what do you do as a banquet manager?

A. I schedule staff. My servers, my

Page 9

bartenders. I oversee setup and tear down, and oversee the day of event.

Q.    Okay. Do you have any other responsibilities, in general, other than those that you've described?

A.    No.

Q.    Do you have involvement in the hiring process, work in that banquet and events department?

A.    I do, yes.

Q.    Okay. Can you describe for me what that hiring process is?

A.    When the resume comes through, I call them to set up an initial interview, and then I have the initial interview with them.

Q.    Okay. And then what do you do after the initial interview?

A.    We usually -- not usually. We think about the candidate, how they interviewed, how it went over, and then usually we call them back if we want to move forward.

Q.    And did you handle that process involving Ms. Jeanna Godwin?

A.    Yes.

Q.    And the information I have indicates

Page 10

that that process occurred in or around summer time of 2021.

Does that sound right to you?

A.    Yes.

Q.    Okay. Do you remember how Ms. Godwin came to you?

A.    She applied through Indeed.

Q.    Do you ever remember having any conversations with any of the other employees at the hotel about recommending Ms. Godwin for the position?

A.    Yes.

Q.    Who is that that you had a conversation with?

A.    My bartender, Debbie, said that her friend had applied through Indeed, but that's all it was.

Q.    Okay. And Ms. Kline described Ms. Godwin as her friend; is that correct?

A.    Yes.

Q.    Were there any other people around that time period who had applied for the bartender job?

A.    Yes.

Q.    Who else had applied around that

Page 11

time period when Ms. Godwin applied?

A.    We just had a couple resumes come through.

Q.    Do you have any remembrance or recollection as to who those resumes were from?

A.    No, I don't.

Q.    Did you set up any interviews with those other applicants who you received their resumes?

A.    Yes.

Q.    Who else did you set up interviews with besides Ms. Godwin?

A.    I don't know their names.

Q.    Okay. Were any of them hired?

A.    No.

Q.    Okay. Did Ms. Kline say anything else to you about Ms. Godwin's candidacy for the position?

A.    No.

Q.    And my understanding was that Ms. Godwin was applying for a banquet bartender position; is that fair to say?

A.    Yes.

Q.    Okay. Did you set up an interview with Ms. Godwin for that position?

Page 12

A.    Yes.

Q.    And did Ms. Godwin come to the hotel in person to interview for that position?

A.    Yes.

Q.    How many times did Ms. Godwin come to the hotel to interview?

A.    Twice.

Q.    Okay. Do you remember when the first interview occurred?

A.    Are you asking for the date?

Q.    That's a great question. Thank you for that clarification.

Do you remember, approximately, when that first interview happened?

A.    I do not. No.

Q.    Okay. I'm going to share my screen with you, Ms. Hutchison, and show you a document. Bear with me a minute.

All right. Now, this document there is a set of text messages here starting at Godwin 0002.

Do you see that?

A.    Yes.

Q.    Okay. And this text message is identified as coming to -- I'll represent to you that this is a document that was produced in

Page 13

discovery. These are text messages that Ms. Godwin -- the text message conversation between you and Ms. Godwin. And it looks like this one came through on Tuesday, August 3rd at 10:33 a.m. And if I may read it.

"Good morning. My name is Caitlin from the George Washington Hotel. I interviewed you a couple weeks ago. I was on a hiring freeze, but I would love to bring you in for paperwork and give you a starting date if you would still like to work with us. I tried calling, but your voicemail is full."

Did I read that correctly?

A.   Yes.

Q.   Did you send this text to Ms. Godwin?

A.   I don't remember sending it.

Q.   Okay. Have you ever looked through your phone if you have any texts with Ms. Godwin?

A.   Yes.

Q.   Do you have any texts with Ms. Godwin?

A.   I do not.

Q.   Okay. All right. And Ms. Godwin responded and replied and said, "Hi Caitlin, my

Page 14

speaker isn't working properly, so I can't hear to fix my voicemail, LOL. I'd love the opportunity. Would next Monday be okay to come in for paperwork, I'm helping my mom move and we only have until Saturday to get her out of there."

Do you recall receiving that text message from Ms. Godwin?

A.   Yes.

Q.   Okay. All right. And would it be fair to say that this was that this is around the time of the second interview, this August 3rd of 2021?

A.   Yes.

Q.   Okay. And does it -- does this refresh your memory as to when, approximately, that first interview happened with Ms. Godwin?

A.   I would estimate around July.

Q.   Okay. Do you remember anything about that first interview with Ms. Godwin?

A.   Not particularly.

Q.   Okay. Do you remember her using any foul language at that first interview?

A.   Yes.

Q.   Okay. What do you remember about her using foul language at the first interview?

Page 15

A.   It was just incorporated in her language.

Q.   Okay. It was just how she talked, so to speak?

A.   Yes.

Q.   Okay. Were you on a hiring freeze in the -- in and around July of 2021?

A.   We stopped hiring for a few weeks, yes.

Q.   Okay. Do you know why that was?

A.   We have slower months than others.

Q.   In July of 2021, that would have been during the pandemic; correct? Maybe?

A.   I don't know.

Q.   Okay. There was a time when people were not booking large events for weddings and anniversary parties and things like that because of the pandemic; correct?

A.   Correct.

Q.   Do you know whether your hotel was booking large events as of July 2021?

A.   I'm not sure.

Q.   Okay. That's fine.

Do you remember anything about Ms. Godwin's attire that she wore during the first interview?

Page 16

A.   Yes.

Q.   What did she wear for that first interview?

A.   She was in jeans and a tank top.

Q.   Okay. All right. Did you think anything about that?

A.   I thought it was unprofessional.

Q.   Okay. Nevertheless, after that first interview, you were willing to bring her back in for a second interview; is that fair to say.

A.   Yes.

Q.   Is there any reason why you were willing to bring Ms. Godwin back in for a second interview, despite her use of coarse language and her, in your words, unprofessional attire?

A.   She would have come back to interview with Rob a second time.

Q.   Mr. Plutto?

A.   Yes.

Q.   Okay. Do you remember meeting with Ms. Godwin to fill out employment paperwork during the second interview?

A.   No.

Q.   Okay. Did you ever present

Page 17

Ms. Godwin with a drug testing policy during the second interview?

A. Yes.

Q. Okay. Did you present her with anything else besides the drug testing policy during the second interview?

A. No.

Q. Okay. During the first interview, did you have any opinions about Ms. Godwin's candidacy to be a banquet bartender?

A. No.

Q. Okay. And during the second interview, did you meet with Ms. Godwin at the hotel?

A. Yes.

Q. Okay. And where did you meet with her in the hotel?

A. She would have come in the front door and we would have gone up to Robert's office.

Q. Okay. And are you in Robert's office right now?

A. No.

Q. Okay. What kind of room are you in right now?

A. A conference room.

Page 18

Q. Did you ever, at any time, meet with Ms. Godwin in that conference room where you're sitting?

A. Yes.

Q. Okay. Was that for the first interview or the second interview?

A. The first interview.

Q. Okay. And is it your testimony that during the second -- that there was a second interview?

A. Yes.

Q. Okay. And where did that interview take place?

A. Robert's office.

Q. Okay. And who was present for that interview?

A. Myself, Ms. Godwin, and Robert.

Q. Okay. And do you remember what Mr. Plutto asked, if anything, as of Ms. Godwin during that second interview?

A. I don't.

Q. Okay. Do you remember whether he was present for that interview?

A. Yes, he was there.

Q. Okay. Did you ask Ms. Godwin any

Page 19

questions during that second interview?

A. No.

Q. Okay. What was said, if anything, during that second interview?

A. I don't remember.

Q. Okay. At any time did you ever talk to Ms. Godwin about submitting to a drug test?

A. Yes.

Q. When did that happen?

A. At the end of the second interview.

Q. And do you remember anything that was said in that second interview, other than discussing a drug test with Ms. Godwin?

A. Just the policies of the drug test itself.

Q. Okay. Were there any other policies discussed besides the drug testing policy?

A. Not that I'm aware of.

Q. Okay. Do you remember anything else about what was said during that second interview meeting?

A. I do not.

Q. Do you remember anything that Ms. Godwin said to you when you discussed the drug test with her?

Page 20

A. She disclosed that she was prescribed methadone.

Q. Okay. Do you know whether Mr. Plutto was present in the room for that disclosure?

A. He was not.

Q. Okay. Do you know was Mr. Plutto in his office?

A. Yes.

Q. And where were you and Ms. Godwin during that discussion?

A. In the hallway right outside of his office.

Q. Okay. But at some point, Ms. Godwin was in Mr. Plutto's office; is that correct?

A. Prior to that discussion.

Q. All right. And what did Ms. Godwin say when you discussed the drug test with her?

A. Just that she was prescribed methadone.

Q. Okay. And what is your understanding of whether -- what is your understanding of the drug policy, does methadone prevent someone from being hired?

A. I don't believe so.

Page 21

Q. Do you know whether -- do you know whether methadone would show up as a positive test on the drug test that is used by the George Washington Hotel?

A. I don't know.

Q. Are you the person who administers drug tests for applicants?

A. Yes.

Q. Okay. Can you explain your involvement in that?

A. We do them on property so we have the drug test here. It's a cup that they fill, and then the sticker gets peeled off and it says what's on there.

Q. And have you ever drug tested someone who tested positive?

A. No.

Q. Okay. Are you aware of what happens if someone tests positive on this drug test where the sticker tells you what they tested positive for?

A. Yes.

Q. What happens?

A. There's different colored lines.

Q. Okay. And describe for me what the

Page 22

colored lines mean?

A. Different colored lines show up for, like, I think -- I believe it's all blue if nothing shows up.

Q. Do you know what any of the other colored lines mean?

A. I do not -- red.

Q. What does red?

A. Red is a positive.

Q. And do you know what kind of drugs red would indicate as a positive?

A. I do not.

Q. When someone tests positive, are they disqualified from employment?

A. Not necessarily.

Q. Okay. Can you explain that for me? How would someone not be subjected to non-employment if they test positive?

A. If it's prescribed.

Q. Okay. So certain prescribed medications may show up on the drug test, but they wouldn't rule someone out for employment; is that fair to say?

A. Yes.

Q. Okay. Did Ms. Godwin ever take a

Page 23

drug test?

A. She did not.

Q. Do you remember any conversations that you had with Ms. Godwin surrounding taking a drug test?

A. She said she wasn't comfortable taking a drug test.

Q. And when did she say that to you?

A. We had filled the paperwork out.

Q. What kind of paperwork did you fill out?

A. New hire paperwork.

Q. And what does that entail, the new hire paperwork?

A. Just basic policies of a new -- a possible new employee.

Q. In that paperwork, is there tax forms for --

A. Yes.

Q. -- the payroll? Okay. What about proof of employment eligibility, like, the citizenship stuff paperwork?

A. Yes.

Q. Okay. And did you present that

Page 24

paperwork to Ms. Godwin?

A. Yes.

Q. And did do you that in the second interview?

A. No.

Q. When did you do that?

A. Are you asking for a date?

Q. No, I'm asking just in general. There are two different times when Ms. Godwin came to the hotel, during the first interview and during the second interview, and then there was another time immediately following the interview in Mr. Plutto's office where you're talking to her in the hallway. Do you remember when you gave her this paperwork to complete?

A. It would have been a few days after the second interview.

Q. And did Ms. Godwin come to the hotel a third time?

A. I don't remember.

Q. Okay. Do you remember the -- do you remember presenting her with this employment paperwork, or are you just assuming that it happened because you had a conversation with her

Page 25

about the drug test?
I'm not trying to trick you, I'm just trying to get a timeline together here.
A.    I just don't remember.
Q.    That's fine.
Now, when Ms. Godwin said that she was not comfortable taking a drug test, did you reply to her at all about that?
A.    I said, we can't move forward without a drug test.
Q.    And did she respond to that statement?
A.    I don't remember.
Q.    Did you ever call Ms. Godwin on the phone and talk to her after her second interview?
A.    I don't remember.
Q.    Do you ever remember having any conversations with Ms. Godwin over the phone?
A.    No.
Q.    Did you ever have any conversations with Mr. Plutto about Ms. Godwin's reticence to take a drug test?
A.    Yes.
Q.    Okay.  When did you talk to Mr. Plutto about that?

Page 26

A.    After she said she wasn't comfortable taking it.
Q.    Immediately after that?
A.    After she would have left the building.
Q.    Okay.  Do you remember having any conversation with Ms. Godwin about whether methadone was a disqualifying positive drug test with her?
A.    I don't remember, no.
Q.    Do you ever remember having any conversations with Ms. Godwin about her ability to pass a background check?
A.    One more time.
Q.    Oh, yeah.  I'm sorry.
Do you ever remember having any conversations with Ms. Godwin about her submitting to a background check?
A.    Yes.
Q.    Okay.  When did you have that conversation with Ms. Godwin?
A.    The second interview.
Q.    Okay.  And what did that conversation entail?  Describe it for me to the best you can remember.

Page 27

A.    We just said that we require a background check and a drug test.
Q.    Okay.  Remember the circumstances surrounding Ms. Godwin leaving the second interview, based on your testimony and testimony of some other witnesses, my understanding is that Ms. Godwin left the hotel without taking a drug test; is that fair to say?
A.    Yes.
Q.    At any time did she refuse to take a drug test?
A.    She said she wasn't comfortable taking a drug test.
Q.    And she explained to you why she was uncomfortable taking a drug test, being that she was on methadone; is that fair?
A.    Yes.
Q.    Okay.  All right.
And then what happened, did she leave, did she get up to leave?  Was there any other conversations after that?
A.    I believe she just left.
Q.    Okay.  And then just so I have the timeline right, then you had a conversations with Mr. Plutto soon thereafter about her -- about Ms.

Page 28

Godwin being uncomfortable taking a drug test; is that right?
A.    Yes.
Q.    What was the context of that discussion?
A.    I told him she was uncomfortable taking a drug test, and he said, we require a drug test for all employees, which is true.
Q.    And then did you report that information to Ms. Godwin?
A.    I don't remember.
Q.    Okay.  Do you remember having any other conversations with Ms. Godwin after she left the hotel that day?
A.    No.
Q.    Okay.  Do you know how much money a banquet bartender earns for an event?
A.    I know their hourly wage, yes.
Q.    Okay.  And what is their hourly wage?
A.    Anywhere between $13 and $15 for experience.
Q.    Okay.  And do you know how much the banquet bartenders earn in tips for an event?
A.    I do not.

Page 29

Q. Did you ever hire anyone to fill the banquet bartender position that Ms. Godwin was applying for?

A. Yes.

Q. And who is that person?

A. Her name is Jessie.

Q. What is Jessie's last name?

A. Finney.

Q. And is Jessie Finney still employed by the hotel?

A. She is not.

Q. Okay. Do you know why Ms. Finney is no longer employed with the hotel?

A. She moved.

Q. How long was Ms. Finney a banquet bartender for the hotel?

A. Between six and eight months.

MR. BAIRD: I think that's all the questions that I have, Ms. Hutchison. Mr. Gestrich might have some questions for you.

MR. GESTRICH: I do. Thank you.

CROSS-EXAMINATION

BY MR. GESTRICH:

Q. Ms. Hutchison, I believe you said you graduated in 2019; is that correct?

Page 30

A. Yes.

Q. Were you employed between 2019 and -- or strike that.

What was the date that you started at the hotel, at the George Washington?

A. May 14th, 2021.

Q. Were you employed between graduation and starting at the hotel?

A. Yes.

Q. Where were you employed?

A. When I grad- -- first job was the Hilton Garden Inn in Cranberry Township, Pennsylvania. Then I jumped to the Hampton Inn by Hilton in Harmarville. And then I was at TRYP -- it's a Wyndham property in Lawrenceville, and then I was here.

Q. And that was all between 2019 through 2021?

A. Yes.

Q. Did you have any experience administering drug tests at those prior locations, prior positions?

A. No.

Q. Was this the first time that you administered drug tests generally, and when you

Page 31

were at the George Washington?

A. Yes. Yes.

Q. Do you have any experience communicating drug testing policies to people other than at the George Washington?

A. No.

Q. When you went to school, did you learn how to communicate drug testing policies to applicants?

A. No.

Q. Did anybody before Ms. Godwin tell you that they were on methadone during an interview?

A. No.

Q. Did you have any training to enable you how to communicate to somebody -- strike that.

Was this the first time that you were discussing with somebody methadone in the context of hiring?

A. Yes.

Q. Were you aware that the George Washington hired people with addictions history?

A. Yes.

Q. Did you understand that the George Washington did not bar employment for addiction

Page 32

history?

A. Once more.

Q. Did you understand that the George Washington -- strike that. I'll rephrase it in a better way. It was a bad question.

Was it your view that the George Washington did not discriminate against people with addiction history?

A. Yes.

Q. Sitting here today, are you having a hard time distinguishing between the first and second interviews?

A. Yes.

Q. Why is that?

A. It was so long ago.

Q. So is it possible that some of the events that you're describing for the first interview occurred in the second interview?

A. It's possible.

Q. Is it possible that some of the events that you're describing in the second interview occurred in the first interview?

A. No.

Q. Sitting here today, are you able to distinguish Ms. Godwin's interview clearly from

Page 33

other interviews of other candidates around the same time?

A. Parts of it.

Q. Sitting here today, do you have a clear recollection, one way or the other as to all of the events that occurred during Ms. Godwin's second interview?

A. One more time. Sorry.

Q. Sitting here today, do you clearly recall all of the events that occurred during Ms. Godwin's second interview?

A. No.

Q. Is it possible that Ms. Godwin completed pre-employment paperwork at the second interview instead of the first?

A. Yes.

Q. Is it possible that -- strike that. Let me rephrase that.

During the second interview, who made the final decision -- strike that. I'm going in a different direction.

Who makes the final decisions on hiring employees at the George Washington?

A. Robert.

Q. Do you have input into hiring

Page 34

employees at the George Washington?

A. Yes.

Q. During the interviewing process and discussions with Ms. Godwin, did you form any opinion about whether or not she should be hired?

A. Yes.

Q. What was your opinion on whether or not she should be hired?

A. Due to her lack of professionalism, I didn't think she should be hired.

Q. Was that after the first interview or the second interview?

A. The second.

Q. Do you recall whether she rescheduled the interview?

A. Yes.

Q. Do you recall how many times?

A. Three.

Q. Did that play into -- or I'm sorry, was that a factor you considered of whether or not to hire Ms. Godwin?

A. Yes.

Q. Okay. Was that a factor against hiring her?

A. Yes.

Page 35

Q. If Ms. Godwin had passed a drug test, would you have recommended that the hotel hire her?

A. No.

Q. Sitting here today, do you clearly recall whether or not Ms. Godwin agreed to a drug test; is that correct?

A. Yes.

Q. Did she agree to submit to a drug test?

A. No.

Q. Was that one of the reasons she was not hired?

A. Yes.

MR. BAIRD: I have no further questions.

MR. GESTRICH: I don't have any follow-up.

MR. BAIRD: Thank you for your time today, Ms. Hutchison.

THE REPORTER: Read and sign sent to you, Mr. Gestrich?

MR. GESTRICH: Yes.

THE REPORTER: And you'd like to purchase a copy of Ms. Hutchison?

Page 36

MR. GESTRICH: Yes. Standard time.

THE REPORTER: Okay. And original to you, sir.

MR. BAIRD: Thank you.

(At 2:01 p.m., the virtual deposition concluded.)

# EXHIBIT 2

Defendant's production No. GW_0099 – List of all employees and dates of employment for applicable time period.

# Hours Worked by Check Month

Check Dates: 01/03/2020 to 08/27/2021

Processes: 2020010301 - 2021082701

The G W Hotel Inc  (83093)

Pay Periods: 12/15/2019 to 08/21/2

| Company | Employee ID | Employee | SSN | Hire Date | Term Date | Pay Type | Current Status | Current Type | January 2020 Payroll Hours | February 2020 Payroll Hours |
|---|---|---|---|---|---|---|---|---|---|---|
| 83093 | 100107 | | | 4/26/2017 | 4/7/2021 | Salary | T | RFT | 240.00 | 160.00 |
| 83093 | 100112 | | | 9/7/2017 | 4/17/2021 | Salary | T | RFT | 240.00 | 160.00 |
| 83093 | 100123 | | | 2/26/2021 | 4/18/2021 | Hourly | XT | RPT | 0.00 | 0.00 |
| 83093 | 100134 | | | 4/6/2018 | 5/29/2021 | Hourly | T | RPT | 166.10 | 147.79 |
| 83093 | 100140 | | | 5/1/2018 | 12/31/2020 | Hourly | T | RPT | 34.05 | 19.78 |
| 83093 | 100142 | | | 5/14/2018 | 5/11/2021 | Salary | T | RFT | 240.00 | 160.00 |
| 83093 | 100151 | | | 5/17/2021 | 8/20/2021 | Hourly | T | RPT | 67.91 | 72.08 |
| 83093 | 100159 | | | 10/18/2018 | 5/22/2021 | Hourly | T | RFT | 240.00 | 160.00 |
| 83093 | 100160 | | | 12/1/2018 | | Hourly | A | RPT | 101.34 | 137.75 |
| 83093 | 100162 | | | 12/14/2018 | 3/1/2021 | Hourly | T | RPT | 0.00 | 7.05 |
| 83093 | 100166 | | | 3/11/2019 | 5/29/2021 | Hourly | T | RPT | 14.11 | 18.15 |
| 83093 | 100167 | | | 3/5/2019 | 5/18/2021 | Hourly | T | RPT | 79.53 | 91.10 |
| 83093 | 100169 | | | 3/24/2019 | 5/17/2021 | Hourly | T | RPT | 0.00 | 0.00 |
| 83093 | 100171 | | | 4/6/2019 | 3/20/2021 | Hourly | T | RPT | 0.00 | 0.00 |
| 83093 | 100172 | | | 2/26/2021 | 5/17/2021 | Hourly | T | RPT | 0.00 | 0.00 |
| 83093 | 100173 | | | 5/9/2019 | 12/31/2019 | Hourly | T | RPT | 11.48 | 0.00 |
| 83093 | 100174 | | | 6/10/2019 | 12/30/2019 | Hourly | T | RPT | 23.80 | 0.00 |
| 83093 | 100176 | | | 6/29/2019 | 2/28/2020 | Hourly | T | TPT | 5.55 | 24.87 |
| 83093 | 100178 | | | 6/29/2019 | 5/17/2021 | Hourly | T | RPT | 24.18 | 14.15 |
| 83093 | 100180 | | | 9/19/2019 | | Hourly | L | RPT | 0.00 | 54.55 |
| 83093 | 100181 | | | 10/20/2020 | | Hourly | L | RFT | 124.79 | 118.40 |
| 83093 | 100182 | | | 9/27/2019 | 12/31/2020 | Hourly | T | RPT | 37.37 | 54.93 |
| 83093 | 100183 | | | 10/3/2019 | 2/14/2020 | Hourly | T | RFT | 134.16 | 26.63 |
| 83093 | 100184 | | | 10/7/2019 | 5/18/2021 | Hourly | T | RPT | 0.00 | 0.00 |
| 83093 | 100185 | | | 11/9/2019 | 10/7/2020 | Hourly | T | RPT | 7.90 | 36.85 |
| 83093 | 100186 | | | 11/23/2019 | 2/19/2021 | Salary | T | RFT | 0.00 | 0.00 |
| 83093 | 100187 | | | 12/13/2019 | 12/31/2019 | Hourly | T | RPT | 32.05 | 0.00 |
| 83093 | 100189 | | | 1/6/2020 | 4/1/2020 | Hourly | T | RPT | 23.65 | 41.63 |
| 83093 | 100190 | | | 4/28/2021 | 4/28/2021 | Hourly | T | RPT | 85.10 | 97.50 |

# Hours Worked by Check Month

Check Dates: 01/03/2020 to 08/27/2021

Processes: 2020010301 - 2021082701

The G W Hotel Inc  (83093)

Pay Periods: 12/15/2019 to 08/21/2

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 83093 | 100247 | | 11/6/2020 | 12/31/2020 | Hourly | T | RPT | 0.00 | 0.00 |
| 83093 | 100251 | | 3/18/2021 | 6/18/2021 | Hourly | T | RPT | 0.00 | 0.00 |
| 83093 | 100252 | | 4/1/2021 | 5/1/2021 | Salary | T | RFT | 0.00 | 0.00 |
| 83093 | 100254 | | 4/13/2021 | | Salary | A | RFT | 0.00 | 0.00 |
| 83093 | 100256 | | 4/26/2021 | | Hourly | A | RPT | 0.00 | 0.00 |
| 83093 | 100257 | | 4/29/2021 | 5/7/2021 | Hourly | T | RFT | 0.00 | 0.00 |
| 83093 | 100259 | | 5/7/2021 | | Hourly | A | RFT | 0.00 | 0.00 |
| 83093 | 100260 | | 5/7/2021 | | Salary | A | RFT | 0.00 | 0.00 |
| 83093 | 100261 | | 5/7/2021 | 1/1/2022 | Hourly | T | RFT | 0.00 | 0.00 |
| 83093 | 100262 | | 5/14/2021 | | Salary | A | RFT | 0.00 | 0.00 |
| 83093 | 100263 | | 5/20/2021 | 6/4/2021 | Hourly | T | RFT | 0.00 | 0.00 |
| 83093 | 100265 | | 5/21/2021 | 6/8/2022 | Salary | T | RFT | 0.00 | 0.00 |
| 83093 | 100266 | | 6/2/2021 | 6/18/2021 | Hourly | T | RPT | 0.00 | 0.00 |
| 83093 | 100267 | | 5/28/2021 | 6/18/2021 | Hourly | T | RPT | 0.00 | 0.00 |
| 83093 | 100268 | | 5/28/2021 | 9/10/2021 | Hourly | T | RPT | 0.00 | 0.00 |
| 83093 | 100270 | | 6/11/2021 | 10/27/2022 | Hourly | T | RPT | 0.00 | 0.00 |
| 83093 | 100271 | | 6/11/2021 | | Hourly | A | RPT | 0.00 | 0.00 |
| 83093 | 100272 | | 6/11/2021 | | Hourly | A | RPT | 0.00 | 0.00 |
| 83093 | 100273 | | 6/11/2021 | 7/2/2021 | Hourly | T | RPT | 0.00 | 0.00 |
| 83093 | 100274 | | 6/11/2021 | 1/1/2022 | Hourly | T | RPT | 0.00 | 0.00 |
| 83093 | 100275 | | 6/13/2021 | 8/27/2021 | Hourly | T | RPT | 0.00 | 0.00 |
| 83093 | 100276 | | 6/23/2021 | | Hourly | A | RFT | 0.00 | 0.00 |
| 83093 | 100277 | | 6/25/2021 | 9/11/2021 | Hourly | T | RFT | 0.00 | 0.00 |
| 83093 | 100278 | | 6/25/2021 | | Hourly | A | RPT | 0.00 | 0.00 |
| 83093 | 100280 | | 7/1/2021 | 7/16/2021 | Hourly | T | RFT | 0.00 | 0.00 |
| 83093 | 100282 | | 7/16/2021 | 5/5/2022 | Hourly | T | RFT | 0.00 | 0.00 |
| 83093 | 10053 | | 9/6/2014 | | Hourly | A | RFT | 217.78 | 159.32 |
| 83093 | 10092 | | 1/25/2008 | 10/8/2021 | Hourly | T | RPT | 24.00 | 25.28 |
| 83093 | 9365 | | 8/12/2012 | | Salary | A | RFT | 0.00 | 0.00 |
| | | | | | | | 448 | 2208.97 | 2079.84 |

# Hours Worked by Check Month

Check Dates: 01/03/2020 to 08/27/2021

Processes: 2020010301 - 2021082701

**The G W Hotel Inc   (83093)**

Pay Periods: 12/15/2019 to 08/21/2...

| 83093 | 100191 | | 1/13/2020 | 2/4/2020 | Hourly | T | RFT | 34.12 | 0.00 |
|-------|--------|---|-----------|----------|--------|----|----|-------|------|
| 83093 | 100192 | | 1/29/2020 | 3/13/2020 | Hourly | T | RPT | 0.00 | 51.79 |
| 83093 | 100193 | | 2/1/2020 | 3/27/2020 | Hourly | T | RPT | 0.00 | 0.00 |
| 83093 | 100194 | | 2/4/2020 | 2/20/2021 | Hourly | T | RPT | 0.00 | 38.03 |
| 83093 | 100195 | | 2/5/2020 | 6/12/2021 | Hourly | T | RPT | 0.00 | 0.00 |
| 83093 | 100196 | | 1/1/2021 | 3/26/2021 | Hourly | T | RPT | 0.00 | 57.53 |
| 83093 | 100197 | | 2/7/2020 | 2/14/2020 | Hourly | T | RPT | 0.00 | 6.98 |
| 83093 | 100198 | | 2/5/2020 | 5/18/2021 | Hourly | T | RPT | 0.00 | 71.70 |
| 83093 | 100199 | | 2/21/2020 | 12/31/2020 | Hourly | T | RPT | 0.00 | 66.00 |
| 83093 | 100202 | | 3/2/2020 | 9/30/2020 | Hourly | T | RPT | 0.00 | 0.00 |
| 83093 | 100203 | | 8/23/2020 | 3/1/2021 | Hourly | T | RPT | 0.00 | 0.00 |
| 83093 | 100206 | | 6/12/2020 | 3/1/2021 | Hourly | T | RPT | 0.00 | 0.00 |
| 83093 | 100207 | | 6/12/2020 | 6/18/2021 | Hourly | T | RPT | 0.00 | 0.00 |
| 83093 | 100209 | | 3/9/2021 | 10/27/2022 | Hourly | T | RPT | 0.00 | 0.00 |
| 83093 | 100210 | | 6/19/2020 | | Hourly | L | RPT | 0.00 | 0.00 |
| 83093 | 100211 | | 6/25/2020 | 3/1/2021 | Hourly | T | RPT | 0.00 | 0.00 |
| 83093 | 100212 | | 7/8/2020 | 12/31/2020 | Hourly | T | RPT | 0.00 | 0.00 |
| 83093 | 100214 | | 8/6/2020 | 9/30/2020 | Hourly | T | RPT | 0.00 | 0.00 |
| 83093 | 100215 | | 8/6/2020 | | Hourly | L | RPT | 0.00 | 0.00 |
| 83093 | 100217 | | 8/17/2020 | 12/31/2020 | Hourly | T | RPT | 0.00 | 0.00 |
| 83093 | 100218 | | 8/18/2020 | 10/30/2020 | Hourly | T | RPT | 0.00 | 0.00 |
| 83093 | 100221 | | 9/9/2020 | 4/18/2021 | Hourly | XT | RPT | 0.00 | 0.00 |
| 83093 | 100222 | | 9/10/2020 | 12/31/2020 | Hourly | T | RPT | 0.00 | 0.00 |
| 83093 | 100226 | | 9/24/2020 | 5/21/2021 | Hourly | T | RPT | 0.00 | 0.00 |
| 83093 | 100227 | | 3/9/2021 | 6/26/2021 | Hourly | T | RPT | 0.00 | 0.00 |
| 83093 | 100228 | | 9/29/2020 | 3/1/2021 | Hourly | T | RPT | 0.00 | 0.00 |
| 83093 | 100229 | | 10/5/2020 | 5/23/2021 | Hourly | T | RPT | 0.00 | 0.00 |
| 83093 | 100230 | | 10/5/2020 | 4/1/2021 | Hourly | T | RPT | 0.00 | 0.00 |
| 83093 | 100233 | | 10/6/2020 | 5/17/2021 | Hourly | T | RPT | 0.00 | 0.00 |
| 83093 | 100234 | | 9/28/2020 | 12/31/2020 | Hourly | T | RFT | 0.00 | 0.00 |
| 83093 | 100239 | | 10/29/2020 | 3/1/2021 | Hourly | T | RPT | 0.00 | 0.00 |

# Hours Worked by Check Month

Check Dates: 01/03/2020 to 08/27/2021
Processes: 2020010301 - 2021082701

The G W Hotel Inc   (83093)

Pay Periods: 12/15/2019 to 08/21/2

| March 2020 Payroll Hours | April 2020 Payroll Hours | May 2020 Payroll Hours | June 2020 Payroll Hours | July 2020 Payroll Hours | August 2020 Payroll Hours | September 2020 Payroll Hours | October 2020 Payroll Hours | November 2020 Payroll Hours | December 2020 Payroll Hours | January 2021 Payroll Hours | February 2021 Payroll Hours |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 160.00 | 160.00 | 160.00 | 160.00 | 240.00 | 160.00 | 160.00 | 160.00 | 160.00 | 240.00 | 160.00 | 160.00 |
| 160.00 | 0.00 | 0.00 | 0.00 | 40.10 | 32.00 | 160.00 | 160.00 | 160.00 | 240.00 | 160.00 | 160.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 139.97 | 0.00 | 0.00 | 90.25 | 180.92 | 146.15 | 142.58 | 68.88 | 124.88 | 108.99 | 109.29 | 88.40 |
| 22.17 | 0.00 | 0.00 | 0.00 | 6.60 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 160.00 | 160.00 | 160.00 | 160.00 | 240.00 | 160.00 | 160.00 | 160.00 | 160.00 | 240.00 | 160.00 | 160.00 |
| 79.03 | 0.00 | 0.00 | 50.15 | 145.15 | 105.60 | 118.74 | 113.59 | 114.95 | 136.80 | 82.55 | 47.62 |
| 160.00 | 31.58 | 31.67 | 126.07 | 240.00 | 160.00 | 160.00 | 160.00 | 160.00 | 240.00 | 160.00 | 160.00 |
| 72.29 | 0.00 | 0.00 | 10.78 | 48.69 | 29.41 | 20.55 | 46.53 | 37.61 | 0.00 | 20.30 | 0.00 |
| 0.00 | 0.00 | 0.00 | 5.42 | 10.85 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 14.17 | 0.00 | 0.00 | 13.75 | 5.02 | 35.40 | 37.95 | 35.04 | 5.53 | 0.00 | 18.88 | 0.00 |
| 34.58 | 0.00 | 0.00 | 0.00 | 7.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 7.97 | 0.00 | 0.00 | 0.00 | 7.53 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 8.12 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 25.88 | 0.00 | 0.00 | 7.65 | 0.00 | 0.00 | 7.78 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 5.20 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 102.96 | 0.00 | 0.00 | 55.34 | 55.09 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60.72 | 0.00 | 0.00 | 30.13 | 43.70 | 64.52 | 38.73 | 103.55 | 65.88 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60.29 | 0.00 | 0.00 | 16.30 | 69.62 | 82.98 | 77.45 | 43.94 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 32.00 | 32.00 | 16.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 26.75 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 100.17 | 0.00 | 0.00 | 18.43 | 14.38 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

# Hours Worked by Check Month

Check Dates: 01/03/2020 to 08/27/2021
Processes: 2020010301 - 2021082701

The G W Hotel Inc   (83093)

Pay Periods: 12/15/2019 to 08/21/2...

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 20.15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 19.96 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 42.78 | 0.00 | 0.00 | 6.17 | 56.81 | 86.74 | 98.50 | 118.90 | 103.69 | 109.01 | 0.00 | 5.37 |
| 55.50 | 0.00 | 0.00 | 7.55 | 15.02 | 16.62 | 20.56 | 31.29 | 28.94 | 6.08 | 30.20 | 0.00 |
| 30.10 | 0.00 | 0.00 | 7.72 | 15.27 | 14.33 | 0.00 | 0.00 | 0.00 | 0.00 | 8.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 25.43 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 91.92 | 62.65 | 22.40 | 44.00 | 17.93 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 10.58 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 23.17 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 100.33 | 14.27 | 46.26 | 5.73 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 29.50 | 85.75 | 14.73 | 0.00 | 0.00 | 6.70 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 7.50 | 11.72 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 6.00 | 16.53 | 8.05 | 8.30 | 13.57 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 6.00 | 8.42 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 6.25 | 8.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 43.52 | 28.20 | 35.67 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 98.12 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 6.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 15.78 | 10.35 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 54.90 | 125.20 | 144.25 | 68.10 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 28.38 | 29.10 | 20.36 | 31.05 | 115.13 | 87.06 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 11.53 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 42.67 | 40.62 | 9.00 | 7.70 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 27.80 | 12.48 | 6.98 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 52.11 | 44.86 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 41.55 | 119.18 | 145.72 | 115.32 | 127.41 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 15.90 | 38.77 | 6.22 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3.73 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 37.18 | 16.63 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 15.37 | 5.73 | 0.00 | 0.00 |

# Hours Worked by Check Month

Check Dates: 01/03/2020 to 08/27/2021

Processes: 2020010301 - 2021082701

The G W Hotel Inc  (83093)

Pay Periods: 12/15/2019 to 08/21/2

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 16.57 | 6.93 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 143.20 | 123.22 | 143.69 | 137.92 | 215.08 | 158.04 | 163.49 | 148.52 | 146.18 | 191.86 | 131.05 | 137.69 |
| 37.46 | 0.00 | 0.00 | 0.00 | 0.00 | 9.17 | 27.48 | 35.60 | 39.83 | 0.00 | 23.28 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **1892.40** | **569.45** | **549.76** | **1000.63** | **1834.05** | **1520.08** | **1713.32** | **1765.52** | **1787.51** | **1746.73** | **1301.70** | **1133.55** |

# Hours Worked by Check Month

Check Dates: 01/03/2020 to 08/27/2021

Processes: 2020010301 - 2021082701

The G W Hotel Inc   (83093)

Pay Periods: 12/15/2019 to 08/21/2

| March 2021 Payroll Hours | April 2021 Payroll Hours | May 2021 Payroll Hours | June 2021 Payroll Hours | July 2021 Payroll Hours | August 2021 Payroll Hours | Total Hours |
|---|---|---|---|---|---|---|
| 160.00 | 80.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2720.00 |
| 160.00 | 160.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1992.10 |
| 86.79 | 58.60 | 0.00 | 0.00 | 0.00 | 0.00 | 145.39 |
| 115.28 | 140.12 | 181.48 | 5.20 | 0.00 | 0.00 | 1956.28 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 82.60 |
| 160.00 | 160.00 | 120.00 | 0.00 | 0.00 | 0.00 | 2920.00 |
| 98.29 | 95.25 | 0.00 | 0.00 | 0.00 | 0.00 | 1327.71 |
| 160.00 | 160.00 | 160.00 | 10.82 | 0.00 | 0.00 | 2680.14 |
| 0.00 | 27.70 | 16.51 | 57.86 | 38.53 | 37.48 | 703.33 |
| 0.00 | 0.00 | 0.00 | 4.50 | 0.00 | 0.00 | 27.82 |
| 9.23 | 34.49 | 33.92 | 6.28 | 0.00 | 0.00 | 281.92 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 212.26 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 15.50 |
| 6.72 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 14.84 |
| 103.04 | 113.58 | 62.18 | 53.87 | 0.00 | 0.00 | 332.67 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 11.48 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 23.80 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 30.42 |
| 0.00 | 6.00 | 0.00 | 32.28 | 0.00 | 0.00 | 117.92 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 59.75 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 456.58 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 499.53 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 160.79 |
| 44.67 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 44.67 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 395.33 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 80.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 32.05 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 92.03 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 315.58 |

# Hours Worked by Check Month

Check Dates: 01/03/2020 to 08/27/2021

Processes: 2020010301 - 2021082701

The G W Hotel Inc   (83093)

Pay Periods: 12/15/2019 to 08/21/2

| | | | | | | |
|---|---|---|---|---|---|---|
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 34.12 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 71.94 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 19.96 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 666.00 |
| 23.71 | 20.28 | 12.35 | 12.18 | 0.00 | 0.00 | 280.28 |
| 8.32 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 141.27 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 6.98 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 97.13 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 304.90 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 10.58 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 189.76 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 136.68 |
| 0.00 | 0.00 | 0.00 | 9.75 | 0.00 | 0.00 | 28.97 |
| 0.00 | 6.90 | 5.58 | 16.27 | 28.17 | 18.93 | 128.30 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 14.42 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 14.32 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 107.39 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 98.12 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 6.25 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 26.13 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 392.45 |
| 106.20 | 93.44 | 0.00 | 0.00 | 0.00 | 0.00 | 510.72 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 11.53 |
| 0.00 | 42.28 | 17.30 | 0.00 | 0.00 | 0.00 | 159.57 |
| 7.82 | 12.87 | 7.47 | 4.25 | 7.62 | 0.00 | 87.29 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 96.97 |
| 114.94 | 95.89 | 85.97 | 58.77 | 0.00 | 0.00 | 904.75 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 60.89 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3.73 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 53.81 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 21.10 |

Paylocity Corporation
(888) 873-8205

User: krowan
Run on 3/17/2023 at 12:03 PM

# Hours Worked by Check Month

Check Dates: 01/03/2020 to 08/27/2021

Processes: 2020010301 - 2021082701

The G W Hotel Inc   (83093)

Pay Periods:  12/15/2019 to 08/21/2

| | | | | | | |
|---|---|---|---|---|---|---|
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 23.50 |
| 7.95 | 34.82 | 5.80 | 35.27 | 0.00 | 0.00 | 83.84 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 84.12 | 68.46 | 63.00 | 50.45 | 266.03 |
| 0.00 | 0.00 | 7.97 | 0.00 | 0.00 | 0.00 | 7.97 |
| 0.00 | 0.00 | 36.07 | 51.55 | 88.53 | 53.07 | 229.22 |
| 0.00 | 0.00 | 96.02 | 227.75 | 251.76 | 152.65 | 728.18 |
| 0.00 | 0.00 | 9.90 | 30.03 | 22.15 | 7.22 | 69.30 |
| 0.00 | 0.00 | 7.00 | 60.68 | 0.00 | 0.00 | 67.68 |
| 0.00 | 0.00 | 0.00 | 6.57 | 0.00 | 0.00 | 6.57 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 0.00 | 0.00 | 0.00 | 17.00 | 0.00 | 0.00 | 17.00 |
| 0.00 | 0.00 | 0.00 | 17.00 | 0.00 | 0.00 | 17.00 |
| 0.00 | 0.00 | 0.00 | 14.50 | 32.79 | 18.90 | 66.19 |
| 0.00 | 0.00 | 0.00 | 21.75 | 52.90 | 64.80 | 139.45 |
| 0.00 | 0.00 | 0.00 | 24.00 | 50.06 | 30.50 | 104.56 |
| 0.00 | 0.00 | 0.00 | 16.00 | 28.31 | 17.34 | 61.65 |
| 0.00 | 0.00 | 0.00 | 8.00 | 7.95 | 0.00 | 15.95 |
| 0.00 | 0.00 | 0.00 | 17.00 | 33.62 | 27.81 | 78.43 |
| 0.00 | 0.00 | 0.00 | 0.00 | 34.25 | 24.47 | 58.72 |
| 0.00 | 0.00 | 0.00 | 0.00 | 19.85 | 7.18 | 27.03 |
| 0.00 | 0.00 | 0.00 | 0.00 | 128.53 | 104.88 | 233.41 |
| 0.00 | 0.00 | 0.00 | 0.00 | 26.02 | 16.00 | 42.02 |
| 0.00 | 0.00 | 0.00 | 0.00 | 54.34 | 0.00 | 54.34 |
| 0.00 | 0.00 | 0.00 | 0.00 | 32.50 | 139.78 | 172.28 |
| 147.03 | 149.05 | 167.17 | 147.97 | 228.16 | 156.38 | 3212.80 |
| 12.95 | 11.18 | 25.03 | 47.12 | 34.61 | 25.22 | 378.21 |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 80.00 | 80.00 |
| **1532.94** | **1502.45** | **1141.84** | **1082.68** | **1263.65** | **1033.06** | **28660.13** |

# EXHIBIT 3

Applicable pages of Transcript of Deposition of Defendant's General Manager, Robert Plutto.

# In the Matter Of:

*GODWIN vs*

*GEORGE WASHINGTON HOTEL*

*ROBERT PLUTTO*

*March 07, 2023*



## Page 1

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JEANNA GODWIN,                    : JURY DEMANDED

   Plaintiff                      :

                      : NO. 22-1099-PLD

       vs.                         :

                      :

GEORGE WASHINGTON HOTEL    :

CORPORATION,                      :

   Defendants                     :

Pittsburgh, Pennsylvania

Tuesday, March 7, 2023

Videotaped Virtual Deposition of:

ROBERT J. PLUTTO, JR.,

Called for oral examination by counsel for the Defendants, pursuant to notice via Zoom technology, before Melissa L. Clark, a Registered Professional Reporter and Notary Public on behalf of Lexitas Legal, beginning at 12:32 p.m., when were present on behalf of the respective parties:

## Page 2

APPEARANCES:

    LAW OFFICES OF ERIC A. SHORE, P.C.
    BY:  GRAHAM F. BAIRD, ESQ.
    Two Penn Center
    1500 JFK Boulevard, #1240
    Philadelphia, Pennsylvania  19102
    (215) 627-9999
    grahamb@ericshore.com
      -- For the Plaintiff

    WHITEFORD, TAYLOR & PRESTON
    BY:  ANTHONY T. GESTRICH, ESQ.
    11 Stanwix Street
    Suite 1400
    Pittsburgh, Pennsylvania  15222
    (412) 275-2400
    agestrich@wtplaw.com
      -- For the Defendants

Also Present:  William Hutchison

        Vivi R. Besteman, Esq.

## Page 3

INDEX TO WITNESSES

WITNESS                                          PAGE

ROBERT J. PLUTTO, JR.

   By Mr. Baird                              4, 37

   By Mr. Gestrich                           27

INDEX TO EXHIBITS

                              PAGE

EXHIBIT      DESCRIPTION                 MARKED

(None offered.)

## Page 4

\* \* \*

P R O C E E D I N G S

\* \* \*

THE REPORTER:  The attorneys participating in this deposition acknowledge that I am not physically present in the deposition room and that I will be reporting this deposition remotely.

They further acknowledge that in lieu of an oath administered in person, I will administer the oath remotely.

The parties further agree that if the witness is testifying from a state where I am not a Notary, that the witness may be sworn in by an out-of-state Notary.

If any party has an objection to this manner of reporting, please state so now.

MR. BAIRD:  No objections.

MR. GESTRICH:  No objections.

THE REPORTER:  Sir, raise your right hand, please.

\* \* \*

ROBERT J. PLUTTO, JR., having been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

Page 5

BY MR. BAIRD:

Q.    Good afternoon, Mr. Plutto. My name is Graham Baird, and I'm a lawyer and I represent Jeanna Godwin in reference to a lawsuit that she's filed against the George Washington Hotel. This afternoon, we are here for your deposition. Could you please state your full name for the record?

A.    Sure. Robert John Plutto, Jr.

Q.    Thank you.

And Mr. Plutto have you ever given deposition testimony before?

A.    Yes.

Q.    Okay. When is the last time you gave deposition testimony?

A.    Five years ago.

Q.    Okay. I'm going to give you some instructions and guidelines to make this go as quickly and smoothly as possible. I am here to ask you questions about what you know surrounding the interview process relating to Jeanna Godwin. Your legal obligation is to provide answers to those questions to the best you can.

Do you understand that?

A.    Yes, sir.

Q.    When you're answering my questions,

Page 6

please try to do so verbally, the court reporter is typing down everything that we say and it's very hard for her to take down nonverbal forms of communication, shrugging your shoulders, nodding your head. We try to avoid things like nuh-huh, uh-uh.

Do you understand that?

A.    Yes, sir.

Q.    Along with that, only one of us should talk at a time. I can, on occasion, be known to be long-winded, so please try to wait for the completion of my question before you answer, and I will certainly give you the courtesy to allow you to fully answer before I ask another question.

Is that acceptable?

A.    Yes, sir.

Q.    If you do not hear one of my questions, if you do not understand one of my questions, if the Zoom is garbled in any way, please tell me and I will restate the question or try to ask it in a better way.

If you answer, the Court is going to assume that you understood the question if you answer.

Is that acceptable to you?

Page 7

A.    Yes, sir.

Q.    All right. You can take a break whenever you want, for whatever reason you want, just let me know that you would like a break. The only caveat to that is if there is a question pending, you are -- the rule requires you to answer the question before we take a break; is that okay?

A.    Yes, sir.

Q.    And I don't anticipate this being a lengthy deposition at all, but again, you can ask for a break whenever you want one. If you do not know the answer to one of my questions, if you do not remember the answer to one of my questions, that is your response. No one here wants you guessing at anything, do you understand that?

A.    Yes, sir.

Q.    Is anyone in the room with you there?

A.    William Hutchison.

Q.    Okay. Is anyone else in the room besides Mr. Hutchison?

A.    No, sir.

Q.    Okay. And you mentioned that you had been deposed about five years ago. Do you

Page 8

remember what kind of case that was?

A.    It was with Marriott for unemployment.

Q.    Okay. The Marriott Hotel?

A.    Marriott International, yes.

Q.    Okay. And were you appearing at a hearing for an employee seeking unemployment compensation?

A.    Yes, sir.

Q.    Okay. Have you ever given any depositions, any other depositions in any other matters that you can remember?

A.    No, sir.

Q.    What is your current job title?

A.    General manager of the George Washington Hotel.

Q.    Okay. And how long have you been the general manager of the George Washington Hotel?

A.    Two years and one month.

Q.    Have you ever held any other positions with the George Washington Hotel?

A.    No, sir.

Q.    Okay. Where did you work before you came to the George Washington Hotel?

Page 9

A.    With Marriott International Concord Hotels.

Q.    And what did you do for Marriott International?

A.    Multiple roles.  Primarily over the last ten years, general manager.

Q.    Was there a specific hotel that you were in charge of as the general manager?

A.    That would be my last one, Fairfield Inn, Pittsburgh Hotel downtown, AC Marriott, Gainesville, Florida.  Courtyard by Marriott, Morgantown, West Virginia, Pittsburgh Center City Marriott, Charlotte Center City Marriott, Spring Hill Suites Marriott, Pittsburgh, Crystal City Crystal Gateway Marriott, Arlington, Virginia.  Those are just the ones I can remember.

Q.    Thank you.

And can you describe briefly your educational background?

A.    I have a college education, bachelor's of science in hotel restaurant institutional management from Mercyhurst University in Erie, Pennsylvania.

Q.    When did you obtain that degree?

A.    1999.

Page 10

Q.    And how did you learn about the position of general manager at the George Washington Hotel?

A.    Mr. Hutchison reached out to me based on my LinkedIn profile.

Q.    Did you fill out an application with the George Washington Hotel?

A.    Yes, sir.

Q.    Did you subject yourself to a background check?

A.    Yes, sir.

Q.    Did you subject yourself to a drug test?

A.    Yes, sir.

Q.    Okay.  Is there currently a drug testing policy at the George Washington Hotel?

A.    Yes, sir.

Q.    Okay.  And what is that policy, if you can generally describe it to me, understanding there is a written policy, but what's your understanding of what that policy is?

A.    Every associate must take and pass a drug test to be hired for employment.

Q.    Okay.  And how is that drug test administered to the associates?

Page 11

A.    It is administered there as -- if it's a female associate, it's happened at the hotel.  The associate would go into the bathroom with the container.  The female associate would stand outside the bathroom.  The associate -- the female would take the drug test, vice versa if it's a male, and then we would -- they would leave the container in the bathroom and we would read the results.

Q.    Okay.

A.    They're not allowed to take any other items or objects into the bathroom with them.

Q.    Okay.  But they are not -- the associates are not supervised by the person who is administering the test; correct?

A.    No.  We're not watching.  Yeah, we're not -- for just overall privacy and humanity-wise no, we don't.

Q.    And are you aware of what kinds of drugs are detected in that test?

A.    It would be just for a -- it would be cocaine, barbiturates, marijuana, opiates.  There's about -- there's about eight different tests that pop up on that test, those would just

Page 12

be some of the ones I can recall.

Q.    Do you know whether methadone is detectable in that test?

A.    It would pop up as an opiate.

Q.    Is methadone a disqualifying substance under the hotel's drug testing policy?

A.    Opiates are, but methadone from what I understand is something that people take to fight an addiction.

Q.    Okay.  Based on that testimony, I'm going to ask you if you know whether methadone would be detected in that drug test as an opiate or whether it is its own separate category.

Do you know that?

A.    No, sir.

Q.    You don't know that?  I just want to be clear.

A.    Yes, it would -- when we've seen it shown up, it's shown up as an opiate.

Q.    Okay.  And what happens -- so have there been other associates that you're aware of who have tested positive for the use of methadone when they are applying for jobs at the George Washington?

A.    There has been one since I have been

Page 13

here.

Q.    Okay. And you know we're going to keep that person's name private for their -- for privacy sake, confidentiality, I think there is a protective order in that case, I'm sure there is.

So that employee did -- was there any accommodation made for that methadone use that was detected by the hotel?

A.    So the person who popped up for the methadone, the opiates, they had multiple positives on their test-wise, so we didn't hone into that. They had multiple categories hit on that. Their example, just honestly there was, I know confidently, there was cocaine, there was marijuana, so at that point, they were not hired at that point.

Q.    And to your knowledge, did that employee test positive for methadone or was it a different kind of opiate, or is there any distinction made?

A.    There is no distinction, sir. It just pops up as -- anyone I've seen it pop up, the one you just mentioned would pop up as an opiate.

Q.    Thank you.

A.    Yes.

Page 14

Q.    Do you know when that person was applying for a position?

A.    It would have been over a year and a half ago. I would say it had to be within the first month -- I started February 14th of 2021, it would have had to have been April or May of that time frame.

Q.    Okay. Do you know what position that person was applying for?

A.    If I can remember correctly, it would have been dishwasher.

Q.    Do you know how many employees there are currently at the George Washington Hotel?

A.    Forty-one.

Q.    Okay. And do you know how many bartenders are currently employed at the George Washington Hotel?

A.    Two. There are three banquet bartenders, and two Bradford's bar bartenders.

Q.    And what is Bradford's bar?

A.    That is its own individual bar within the hotel, which are hired individual bartenders who have, let's say, a more abundance of bartender training, and have more computer knowledge based on our point of sale system.

Page 15

Q.    Okay. But that Bradford's bar, that's still owned and operated by the hotel; correct?

A.    Yes. Yes, sir.

Q.    Okay.

A.    You would just be hired for two different positions.

Q.    So are there five bartenders total or are there three and two of them work at the bar?

A.    There's five total across the board.

Q.    Okay. Thank you.

And do you know who those bartenders are? Can you name them?

A.    Yes, we have Debbie.

Q.    What is Debbie's last name?

A.    Kline, K-l-i-n-e.

Q.    Thank you.

A.    The next one would be Candace Barman, B-a-r-m-a-n. Would you like me to continue with banquet or just --

Q.    Yes. Who are the banquet bartenders?

A.    And the last one would be Lisa Plassio, P-l-a-s-s-i-o.

Page 16

Q.    All right. Thank you.

And how long has Ms. Kline been employed as a bartender with the hotel if you know?

A.    Over four and a half years.

Q.    And Ms. Barman, how long has she been employed as a bartender?

A.    Two months.

Q.    And Ms. Plassio, how long has she been employed?

A.    Nine months.

Q.    Okay. All right.

And back in summertime of 2021, are you aware of Jeanna Godwin applying for a bartender job?

A.    Yes, sir.

Q.    What is your understanding of what the position was that Ms. Godwin was applying for? Was it for a bartender at the Bradford's bar, or was it a banquet bartender?

A.    On-call banquet bartender.

Q.    And prior to Ms. Godwin applying for that position, had you ever interacted with her or met her before to your knowledge?

A.    No, sir.

Q.    Okay. Did you have any input into

Page 17

whether to hire Ms. Godwin?

A.    Yes, sir.

Q.    Okay.  Tell me about your involvement in that decision as to whether to hire Ms. Godwin.

A.    So before anyone at the hotel is hired or terminated at the hotel, I'm the final decision maker in the process.  The aspect of it is, before Ms. Godwin were to be hired, she would have came, interviewed with me directly.  She would have had to pass her background as well as her drug test.

Q.    Okay.  Did Ms. Godwin ever sit for an interview with you?

A.    No, sir.

Q.    Okay.  Do you know why not?

A.    She never -- she decided not to take her drug test.

Q.    How do you know that Ms. Godwin decided not to take her drug test?

A.    Caitlin Hutchison came over to my office, which is directly from where the interview was taking place.  She said to me, Ms. Godwin has a preexisting condition that she -- a methadone addiction issue previously in her background.  I

Page 18

said, okay.  Like all staff, she must take a drug test, and then we'll base the results on that.

Q.    Did you ever say, she needs to pass the drug test with flying colors?

A.    No, I don't -- I wouldn't know what that means.

Q.    Okay.  Did you ever tell Ms. Hutchison that Ms. Godwin would not be offered a position in the event that she tested positive for an opioid?

A.    It never got to that point at all.  We just got to the point of she must take a drug test.

Q.    Was Ms. Godwin still in Ms. Hutchison's office, or the conference room --

Where was Ms. Hutchison interviewing Ms. Godwin?

A.    So the room that I'm currently in right now, my office sits directly across the hallway, which is probably a four foot distance-wise, and the office doors would have been open in between.

Q.    Okay.  And so the room that you're sitting in now was where Ms. Hutchison would be interviewing Ms. Godwin?

Page 19

A.    Correct.

Q.    Okay.  And when Ms. Hutchison came into your office to advise about the preexisting condition, as you put it, was Ms. Godwin still in the room that you're sitting in now?

A.    From my understanding, yes, I didn't see her directly, but yes.

Q.    You never saw her on that date when she was there?

A.    No, sir.

Q.    Okay.

A.    She didn't get to the point of the final interview with me, so I didn't see her directly.

Q.    Okay.  And did you ever hear her talking to Ms. Hutchison?

A.    Yes, sir.

Q.    And did you ever hear Ms. Godwin decide or elect not to take a drug test?

A.    No, sir.

Q.    Okay.  Did you ever hear Ms. Godwin say that she would not subject herself to a background check?

A.    No, sir.

Q.    Okay.  Did you ever hear anything

Page 20

specifically, any conversation between Ms. Hutchison and Ms. Godwin?

A.    So just for the situation, Ms. Hutchison was in here prior to the day that I'm talking, that me and you are speaking of right now.  So the background check would have been done directly with Caitlin her first day that she came to the hotel, which, from my understanding, was about 12 days until her last interaction at the hotel.

Q.    So Ms. Godwin, to your understanding, came to the hotel twice with regards to this job?

A.    Correct.

Q.    Okay.  And the first time that she came to the hotel, do you know what the purpose of that meeting was?

A.    With Caitlin initially.

Q.    Okay.  And then the purpose of the second meeting, do you know what that was for?

A.    That would have been to fill out paperwork, meet with me and to take her drug test.

Q.    And how did you find out that Ms. Godwin decided not to take her drug test?

A.    From Bob, I never heard back from

Page 21

her. She was not hired. She did not meet with me that day directly. Spoke to Caitlin and she said that she did not take her drug test, which for me would be, as I mentioned, a hiring aspect.

Q.   Okay. So you meet with every new hire for an interview; is that fair to say?

A.   Yes, sir.

Q.   Did you ever see Ms. Godwin at any point when she came to the hotel for the purpose of these meetings?

A.   No, sir.

Q.   And you never met with her?

A.   No, sir.

Q.   Okay. Did you ever talk with her over the phone about the job?

A.   No, sir.

Q.   Okay. Well, you testified earlier that you did hear her and Ms. Hutchison talking; is that fair to say?

A.   Yes, sir.

Q.   Okay. Do you remember anything about what you heard in those conversations?

A.   Yes, sir.

Q.   I'm sorry. The Zoom glitched there.

A.   Yes, sir. I heard some

Page 22

inappropriate language, there was cursing, something that -- there was language being used in the interview that would be very nonchalant, some way you would talk to your friends, maybe, in a non-professional environment.

Q.   As specifically as you can, what did Ms. Godwin say?

A.   Using -- was using the F word, damn, hell, F-ing, words that are very -- not something I'm very common with the hiring process.

Q.   And when Ms. Hutchison came in to your office to talk to you about the drug test issue and Ms. Godwin's methadone prescription, did she say anything to you about the inappropriate language and the cursing?

A.   We didn't even get to that point, she -- I could hear the conversation, so when Caitlin came to me, Ms. Hutchison came to me directly, mentioned the drug test and the failure to want to take the drug test, that was pretty much just added into the hiring process.

Q.   So is it fair to say you and Ms. Hutchison didn't have a conversation about any inappropriate language or cursing at that time when she came into your office to talk about the

Page 23

drug test issue?

A.   No, sir, that's correct. Yes, you're correct.

Q.   Okay. Thank you. Thank you. And you said that Ms. Hutchison came in to tell you that -- well, let me ask you this: What did Ms. Hutchison say when she came in to you to talk to you about the drug testing issue?

A.   She mentioned that Ms. Godwin had -- was on methadone and she -- I said, okay. Like, all of the other staff, she will have to take a drug test and we'll see what the results are.

Q.   Okay. Was anything else said during that meeting?

A.   No, sir. It was very quick, Ms. Godwin, as you mentioned earlier, would have been in the room next door, so, yeah.

Q.   Okay. Do you have any knowledge as to how Ms. Godwin found out about the bartender position with the hotel?

A.   She was referred, from what I understood, by Deborah Kline.

Q.   Okay.

A.   And Ms. Kline actually came to me

Page 24

directly and said that she has someone she's worked with, or has known in the past -- that comment, she's worked with, and/or known in the past, and that she would like to apply for the banquet bartender position.

Q.   Okay. And then at that point, as mentioned, Caitlin would have done the initial interview process?

A.   Okay.

Q.   Has the drug testing process or policy changed at the hotel since summertime of 2021?

A.   No, sir.

Q.   After the meeting in your office with Ms. Hutchison, did you have any other conversations with Ms. Hutchison about Jeanna Godwin's hiring process or the decision not to hire her?

A.   No, sir.

Q.   When did you learn that Ms. Godwin was not going to submit to a drug screening?

A.   I did not hear anything regarding Ms. Hutchison at any time -- excuse me, regarding Ms. Godwin, there was no conversation moving forward.

Page 25

The next time I heard was when Mr. Hutchison, Mr. William Hutchison stated that we had EEOC charges filed.

Q. Okay. So just so I'm clear, the meeting with Ms. Hutchison, in your office, you advised her that Ms. Godwin would have to subject herself to a drug test; correct?

A. Correct, sir.

Q. Okay. And at that time -- and then Ms. Hutchison left your office; is that fair?

A. Correct, sir.

Q. Okay. And did you -- did you go into the room with Ms. Godwin; do you know?

A. I'm not sure.

Q. Okay. At that time, did you know whether Ms. Godwin was still there at the hotel when you were talking with Ms. Hutchison?

A. No, sir.

Q. Okay. You don't know one way or the other whether she was still there?

A. Yeah, after that -- after me -- after I told Caitlin, I know Ms. Hutchison was in the office, I don't know past that point if they walked out together, what the -- there's different -- you know, how she left the hotel, I'm

Page 26

not sure about that.

Q. Okay. And then the next time that you ever have any, kind of, conversation with anyone about this was after an EEOC charge was filed; is that fair to say?

A. Correct. Yes.

Q. Do you know how much money a banquet bartender makes, or earns for one night?

A. I can tell you a couple different numbers. For the yearly salary for our most senior banquet bartender, which would have been Deborah, she made $5,735 last year.

Q. Is that money that is paid by the hotel, or is that money that is paid in tips, or is that --

A. So that would be by the hotel, that would be her hourly -- that would be her days worked times her hourly salary. And then to answer your next question regarding tips, counting tips with them at the night, they average anywhere between $50 and $75 a night. And then oftentimes -- some nights are better than others, some weddings are larger than others, but the average would be between $50 and $70.

Q. Do you know if Ms. Kline has any

Page 27

other employment besides the George Washington Hotel?

A. No, sir.

Q. You don't know?

A. She's only worked -- I do not. I know that she works here for us.

Q. Okay.

A. I can only tell -- I can only base my employment on her working for me.

Q. Okay. Understood. Understood. Is there any policy that the hotel has about people having multiple jobs --

A. No, sir.

Q. -- who are bartenders?

A. No, sir.

MR. BAIRD: All right. Mr. Plutto, I think that's all of the questions that I have. Mr. Gestrich may have some questions for you.

CROSS-EXAMINATION

BY MR. GESTRICH

Q. So Mr. Plutto, you mentioned that there's a drug policy at the hotel. Why does the hotel have a drug testing policy?

A. We have a drug-free workplace, and that's also -- that's to protect our associates.

Page 28

That is to protect our staff, and that's also to protect the hotel in general, the clientele.

Q. Is there a particular importance to having a bartender drug tested?

A. Yes, 100 percent. They service other customers, and as well as knife skills, as well as over serving drinks could be a potential concern. Basically aspects of possible DUIs, those would be the issues.

Q. So every employee that comes through is drug tested; is that correct?

A. Yes, sir.

Q. Would Jamie Langigan have been drug tested?

A. Yes, sir.

Q. Do you know what date Jamie Langigan was hired?

A. She would have been hired in June of 2021.

Q. Do you know whether Ms. Langigan was on methadone at any time during her employment?

A. She came from a place called The Turning Point, which The Turning Point is where many of our staff comes from. It's a halfway house, and in conversations with Jamie after she

Page 29

took her drug test, she mentioned that she was on methadone.

Q.  Did Ms. Lanigan's drug test come back positive for anything?

A.  It came back negative across the board.

Q.  Do you know whether Ms. Mariah Wills, whether she was hired by the hotel while you were there?

A.  Yes, sir.

Q.  Do you know whether she was an addiction counselor?

A.  Yes, sir, she was.

Q.  Was she?

A.  Yes, sir.

Q.  Okay.

A.  She was actually in charge, she's a team leader of the addiction home.  So she's in charge of all the young ladies, and she actually started at the hotel and then has moved into a management role at the addiction home.

Q.  Do you know what position Ms. Langigan held at this hotel?

A.  She was a banquet bartender, as well as a server.

Page 30

Q.  She was hired before Ms. Godwin was interviewed; is that correct?

A.  Correct.

Q.  Ms. Mariah Wills, do you know whether she was hired before or after Ms. Godwin's interview?

A.  Before.

Q.  Do you know the name Sarah Mayes?

A.  Yes, sir.

Q.  How do you know that name?

A.  Sarah worked for us as a banquet bar -- excuse me, a banquet server.  And she also worked for us in our Greek restaurant called Cucina as a cashier.

Q.  Do you know anything about Sarah Mayes's background in terms of whether she's been in addiction recovery?

A.  Yes, sir, she was.

Q.  She was.

Was that known to you before she was hired?

A.  Yes, sir.

Q.  Was that also known to you -- strike that.

Was Ms. Lanigan's treatment at an addiction center known to you before she was hired?

Page 31

A.  No, sir.

Q.  Was Ms. Wills' known to you before she was hired?

A.  Yes, sir.

Q.  Have you ever heard the name Jessie Finney?

A.  Yes, sir.

Q.  Who is Jessie Finney?

A.  She was one of our banquet bartenders.

Q.  Do you know whether she is from an addiction center as well?

A.  Yes, sir.

Q.  Do you also know whether or not she is on methadone?

A.  Yes, sir.

Q.  Was methadone a bar to any of these employees being hired?

A.  No, sir.  It was -- they would all have to take a drug test.  They all followed the process and took their drug test.

Q.  Do you recognize the name Timothy McClung?

A.  Yes, sir.

Q.  How do you know the name Timothy

Page 32

McClung?

A.  When I started the hotel on February 14th, 2021, Timothy was the front desk manager at the hotel.

Q.  Do you know whether or not he was on methadone?

A.  Yes, sir.

Q.  Was he on methadone?

A.  He was.

Q.  So I want to talk about the hiring process.  Can you walk through what is the hiring process from application to hire?

A.  Excuse me, yes.

The applicant would either -- a couple different options, they would apply on Indeed, they would be recommended or they would turn in a resume at the front desk of the hotel.

The initial step is they would meet with the hiring department manager of the initial interview.  For example, if it's a banquet bartender, it would be Caitlin.  They would meet, decide the approval process, if Caitlin wants to move them along or not or how she feels about the person.  They would then come in for the next step, fill out new hire paperwork and paperwork

Page 33

for a background check. If they would pass that background check and start -- pass that background check, they would then interview with me. If they interviewed with me and I decided to move forward, they would then take their -- they would then move forward and take their drug test, and then we would do new hire orientation and hire them.

Q. So one of the last steps in the process is meeting with you?

A. Yes, sir, it is, it's the last steps.

Q. Are you the final decision maker for whether somebody is hired or not?

A. Yes, sir.

Q. Setting aside the drug test for Ms. Godwin, would you have hired Ms. Godwin if she came back with a clean drug test?

A. Based on the language that I heard and the vulgarity, I would have had a sit-down with her and had some serious conversation. By her declining the drug test, basically, she disqualified herself for even me to meet with her at that point.

Q. And were you under the understanding that she was declining the drug test?

Page 34

A. Yes, sir.

Q. Is that why you never met with her?

A. Yes, sir.

Q. The banquet bartenders, I think you mentioned that there was a main bartender, and I believe you mentioned that was Debbie; is that correct?

A. That's correct.

Q. Does Debbie work all wedding events?

A. Debbie works all wedding events. She works every event alone also that's under 150 guests.

Q. How many bartenders are there total at a wedding with more than 150 guests?

A. Two.

Q. Two. So if I'm understanding correctly, when there is an event with 150 or less, there is one bartender, 150 or -- well, or is it more than 150?

A. Over 150, it would be two. Under 150, it would be one, which would be Deborah.

Q. Okay. Is that what's referred to as a back-up bartender that works with Deborah?

A. Yes, it would be a barback, back-up bartender, yes. And they would split tips with

Page 35

Deborah at that point.

Q. Is that the position that Ms. Godwin was applying for?

A. Yes, sir.

Q. Do back-up bartenders or barbacks, however you phrase it, do they help set up for an event in the days leading up to the event?

A. No, sir.

Q. When do they work for the event?

A. The day of the event, which would typically be 4:00 to 10:00 or 5:00 to 9:00.

Q. Okay. So it's either, you know, four to six hours for the event?

A. On average, yes. Five hours would be the average for our events, yes.

Q. Do you know how many events there have been since August 2021 with more than 150 guests?

A. Fifteen.

Q. Fifteen?

A. Yes.

Q. Now, if there is a very large event, is it fair to say that there are additional tips available for that very large event sometimes?

A. Not necessarily. To be really

Page 36

honest with you, it's based on the individual. There's no percentage. There's no gratuity or credit paid out on that, so it is based solely on what the customer wants to pay. And the customer, I seen the person who is invited to the wedding if they decide to tip the individual or not. Some nights Debbie may walk out of here with $150, some days she may walk out of here with $40 depending -- it doesn't make a difference, to be honest, with you, of how big or small the wedding is, unfortunately, that's just how it works.

Q. Do barbacks receive any type of benefits?

A. No, sir.

Q. Do they receive any type of vacation time?

A. No, sir.

Q. Do they receive any type of paid sick time?

A. No, sir.

Q. So the compensation that's paid is limited to the hourly wage that they receive, plus tips?

A. Yes, sir. And that's for all staff, excluding management.

# EXHIBIT 4

Applicable pages of Transcript of Deposition of Plaintiff, Jeanna Godwin.

# In the Matter Of:

*GODWIN vs*

*GEORGE WASHINGTON HOTEL*

*JEANNA GODWIN*

*March 07, 2023*



## Page 1

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JEANNA GODWIN,                  : JURY DEMANDED
     Plaintiff              :

                           : NO. 22-1099-PLD
          vs.              :
                           :
GEORGE WASHINGTON HOTEL     :
CORPORATION,               :
     Defendants            :

                Cannonsburg, Pennsylvania
                Tuesday, March 7, 2023

Videotaped Virtual Deposition of:
                    JEANNA GODWIN,
          Called for oral examination by counsel for
the Defendants, pursuant to notice via Zoom
technology, before Melissa L. Clark, a Registered
Professional Reporter and Notary Public on behalf of
Lexitas Legal, beginning at 9:30 a.m., when were
present on behalf of the respective parties:

## Page 2

APPEARANCES:
     LAW OFFICES OF ERIC A. SHORE, P.C.
     BY: GRAHAM F. BAIRD, ESQ.
     Two Penn Center
     1500 JFK Boulevard, #1240
     Philadelphia, Pennsylvania  19102
     (215) 627-9999
     grahamb@ericshore.com
        -- For the Plaintiff

     WHITEFORD, TAYLOR & PRESTON
     BY: ANTHONY T. GESTRICH, ESQ.
     11 Stanwix Street
     Suite 1400
     Pittsburgh, Pennsylvania  15222
     (412) 275-2400
     agestrich@wtplaw.com
        -- For the Defendants

Also Present:  Wale Akintunde, Videographer

                William Hutchison

                Vivi R. Besteman, Esq.

## Page 3

INDEX TO WITNESSES

WITNESS                                    PAGE

JEANNA GODWIN

     By Mr. Gestrich                        6


                INDEX TO EXHIBITS

                                    PAGE
EXHIBIT      DESCRIPTION             MARKED

A            Work history            16

B            Interrogatory responses  67

C            Text message            82


          (Exhibits retained by Mr. Gestrich.)

## Page 4

                    * * *
          P R O C E E D I N G S
                    * * *
          THE VIDEOGRAPHER:  We are now on the record.  My name is Wale Akintunde, and I'm the videographer retained by Lexitas.  This is the video deposition for the United States District Court for the Western District of Pennsylvania.  Today's date, March 7th, 2023, and the video time is 9:30 a.m. Eastern Standard Time.
          This deposition is being taken via Zoom with conferencing with the deponent, counsel, and the court reporter are attending the deposition via an interconnection from their separate locations.
          In the matter of Godwin V. George Washington Hotel Corp, et. al, the deponent is Jeanna Godwin.  All counsel will be noted on the stenographic record.
          Would all counsel please identify themselves.
          MR. BAIRD:  Sure.  My name is Graham Baird.  I'm from the law offices of Eric Shore.  B-a-i-r-d is my last name, and I represent the Plaintiff, Jeanna Godwin.

Page 9

given has to be a verbal answer and not an uh-huh or uh-uh or --

A. Yes, sir.

Q. -- something else like that?

Also, please avoid any type of answers through a head nod or a head shake or anything like that, because the court reporter can't just transcribe that.

A. Okay.

Q. The next thing, we can only have one person talking at a time. And so if you're talking, I will try to avoid interrupting you, and I would ask that you do the same whenever I'm talking, and that's so that the court reporter can transcribe a clean report without any back and forth on the transcript.

A. Yes, sir.

Q. If you don't understand a question, please let me know and I can try to rephrase the question in a different way.

If at any point you need a break, we can take a break, but if there's a question pending, I ask that you finish the question before we take a break.

A. Okay.

Page 10

Q. So where do you currently reside?

A. Cannonsburg, Pennsylvania.

Q. What is your address?

A. 120 Cherry Street, Cannonsburg, Pennsylvania 15317.

Q. How long have you lived at your home?

A. Two years.

Q. Two years. Do you rent or do you own?

A. I rent.

Q. Do you receive any type of housing subsidization?

A. I do. I receive HUD.

Q. HUD?

Who lives at home with you?

A. Me and my three children.

Q. Are you married?

A. I'm a widow.

Q. Okay. My condolences.

A. Thank you.

Q. Can you briefly describe your educational history, starting with post high school, so anything -- high school and before you don't have to describe.

Page 11

A. Okay. Well, I graduated high school. I have a two-year Associate's degree from Penn Commercial, medical assistant and Phlebotomy.

Q. Okay. Did you receive any other type of training, other than medical assistant phlebotomy after your associate's degree?

A. I tried to go and do medical billing and coding, but it just was not for me, could not comprehend.

Q. Have you worked in the medical assistant or phlebotomy field after your Associate's degree?

A. I actually took care of my elderly grandparents and uncle for a few years while serving in bartending.

Q. When did you do that work?

A. Which work?

Q. The phlebotomy and medical assistant part, taking care of your grandparents, I should say.

A. I did it -- I graduated in 2010. So basically from then on I stayed with them, and I was their in-home caregiver, all the while going to work and raising kids.

Q. How long did you work for your

Page 12

grandparents?

A. Until they passed.

Q. What year was that?

A. 2018 my uncle passed away, I believe. My late husband passed away in 2011, my uncle passed away in 2012, and my grandparents both passed away in January of 2018, two weeks apart.

Q. My condolences on that as well.

A. Thank you.

Q. Have you worked in the medical field other than with your grandparents?

A. No, sir.

Q. Have you pursued any employment in the medical field after your grandparents passed?

A. I did not.

Q. So tell me a little bit about your work history as a bartender. How long have you worked as a bartender, and where have you worked?

A. I started serving at 16, started at Eat 'N Park. And from there, I've opened restaurant bartending and serving, and I've done that work from being 16 until this year.

Q. How long would you estimate that you stay at an employer when you work for them, just

Page 13

ballpark estimate?

A.    Myself?

Q.    Yes.

A.    Like how long I averaged?

Q.    Yes, you.

A.    Maybe about a couple months to a few years.

Q.    Have you ever been terminated from any of those positions involuntarily?

A.    Involuntarily, Kings.

Q.    Kings?

A.    Yes.

Q.    Why were you terminated from Kings?

A.    Drug use.

Q.    Drug use.

What year was that?

A.    My husband was still alive, so I didn't have Dominick, so probably 2004, early 2000s. Both of my children were born, 2001, 2003 and it was around then in that area.

Q.    Are you certain it was from Kings and not from another restaurant?

A.    That I was fired from?

Q.    Yes. For the drug use that you're describing, are you for certain that was from

Page 14

Kings?

A.    I know that was from Kings. I know that was from Kings. I remember the entire staff and management.

Q.    For HUD, do you have to report any income to HUD that you receive?

A.    I do.

Q.    You do?

A.    They receive my pay stubs.

Q.    Your pay stubs.

Do your pay stubs include tips?

A.    Yes, sir.

Q.    Do your pay stubs reflect all tips that you receive?

A.    The required amount, yes, sir.

Q.    What do you mean the required amount?

A.    The 20 percent that we were supposed to claim by law.

Q.    So if you receive 25 percent tips, do you report the 25 percent or the 20 percent?

A.    The 20 percent.

Q.    If you receive less, do you report 20 percent or do you report the less amount that you receive?

Page 15

A.    It always goes by 20 percent of sales. So it does not matter what is in my jar, whatever 20 percent is, is 20 percent. Sometimes I go higher, 30 percent.

Q.    But you don't report those higher amounts?

A.    That's not necessarily true. It depends on the day and what I -- I never claim lower than 20, but I will claim higher than 20.

Q.    I'm going to share my screen to take a look at a document. Give me one second.

Are you able to see this document on your screen?

A.    I am. I am.

Q.    Do you recognize this document?

A.    I do.

Q.    Who wrote this document?

A.    I did.

Q.    When did you write this document?

A.    Before the beginning of the year, so I would say December.

Q.    Are you able to read the top words of this document where it says Eat 'N Park?

A.    I now see my text message.

Q.    One second, let me figure out --

Page 16

A.    I see the text message from Caitlin, that's Washington Health System.

Q.    Are you able to see work history?

A.    I am. I am.

Q.    It does not appear that there is a document number at the bottom of this. I would like to mark this as Exhibit A for the record.

(Exhibit A marked for identification.)

BY MR. GESTRICH:

Q.    And it appears from this paper that in 2000 to 2003 to 2004, you worked at Eat 'N Park; is that correct?

A.    Yes, sir. To the best of my knowledge, yes. I tried to go backwards to do my employment, yes.

Q.    Do you recall why you do not -- do you recall why your employment terminated from there?

A.    I do not know. I do know that I was using at that point, but I do not remember as to why I believe -- I thought it was due to my tardies, and being late is what I was told.

Q.    So were you involuntarily terminated from that employment?

A.    I think everybody is involuntarily

Page 17

terminated when they're terminated.

Q. So you did not quit from Eat 'N Park, you were terminated from there?

A. I believe so, yes, sir.

Q. Then the next line I see Ambrogi's-'02.

Do you see that same line?

A. I do. It might have been a year -- I want to say it was '02, '03, but yes, sir. I only worked there a few months, it was closed.

Q. A few months. Is that the reason your employment terminated there?

A. I'm sorry?

Q. Did you quit from Ambrogi's?

A. It was closing.

Q. It was closing?

A. So we were all given a final date to work. I worked at Ambrogi's from 10:00 to 2:00 and went in at Eat 'N Park at night.

Q. And then the next line it appears to say, Bob Evans?

A. Yes, sir.

Q. Then there is the numbers '04 to '05?

A. I believe so. I opened that

Page 18

restaurant when I left Ambrogi's, I went ahead and found employment at Bob Evans where they were opening a new restaurant, so I was on the opening crew for that.

Q. Between 2002, you worked at Ambrogi's --

A. That was only a few months, yes, sir.

Q. A few months.

And then was this 2004 then that you started at Bob Evans?

A. I believe so, that's when they opened.

Q. Were you working --

A. The one in McMurray.

Q. Were you working at Ambrogi's and Eat 'N Park at the same time?

A. Yes, sir.

Q. So at Bob Evans you worked there until 2005; is that correct?

A. Something around there. I was guesstimating. It's been a long time.

Q. Why did your employment at Bob Evans end?

A. I left there, the money wasn't good

Page 19

and I moved out to Arden, PA, which is like Meadowlands. So the commute to Meadowlands to McMurray, I just couldn't do it.

Q. Do you recall about how many months you worked there?

A. Bob Evans?

Q. Yes.

A. I worked there until it was open and they were fully staffed.

Q. Do you recall around what time of the year in 2004 you started?

A. I know it was nice outside during training, so I want to say spring summer.

Q. In the spring or summer.

And then in 2005 when you ended your employment there, do you remember about what time of the year that was you ended your employment?

A. I do not.

Q. In the next line it appears to say Pizza Hut server '05?

A. Yes.

Q. Why did your employment at Pizza Hut end?

A. Because I was raided, caught selling

Page 20

drugs.

Q. Were you involuntarily terminated from that job?

A. Once again, I believe when somebody is terminated, they're always involuntarily terminated.

Q. The next line it says, Moose Club.

Is that correct?

A. Yes, sir.

Q. It says '05-'06 and then it has a slash '07. Does that mean that you were hired in 2005 and you ended your employment in either 2006 or 2007?

A. That means I started between '05 and '06 until 2 -- I think. No, I started in '05 shortly after -- well, I guess it would have been '06.

However, I only worked there to help out my Aunt Holly who needed servers and bartenders.

Q. Do you recall how many months you worked there?

A. I do not.

Q. Do you recall if it was more or less than one year?

A. I do not recall.

Page 21

Q.   Why did your employment at Moose Club terminate or end?

A.   I wasn't a permanent being. I was in there to help out, and I was going to school at that point, I believe. Maybe I wasn't, maybe it was beforehand.

Q.   Did you quit from the Moose Club?

A.   I did.

Q.   Then the next line it has the phrase, Amigos?

A.   Yes, sir, there were two of them.

Q.   Okay. Which location did you work at?

A.   Both.

Q.   Okay. When you say "both," what are the two locations, where are they?

A.   Amigos, it was in McMurray where the Anthony's Cold Fire Pizza is.

Q.   And the other location?

A.   Inside the Galleria, top floor to the right, I don't know what's there now.

Q.   Okay. Inside the Galleria. Where is the Galleria located?

A.   South Hills.

Q.   Is that the Galleria at the corner

Page 22

of Washington and Connor? Does that make -- does that ring a bell?

A.   I believe Washington Road. It is on the corner -- I want to say on the corner of 19.

Q.   Is that maybe several blocks from the South Hills Village Mall?

A.   Yes, sir.

Q.   Okay. Why was your -- why did your employment end at Amigos?

A.   They closed. They were closing.

Q.   Okay. So when the restaurant closed, you --

A.   Yes, sir.

Q.   -- lost your position there?

A.   Yes, sir. And I was going to school during then, too.

Q.   And then the next line has Kings?

A.   Yes.

Q.   Is this the time period that you referenced that you were involuntarily terminated for drug use?

A.   Yes, but that's -- that date is not right, I worked at Kings before I had my son, and he was born in '08. So I don't know why I wrote that. I was working when I wrote this.

Page 23

Q.   Where were you working when you wrote this?

A.   Hart's.

Q.   Hart's, okay.

A.   Yes, so that '9 to '11, that's not right.

Q.   Okay. What dates did you work at Kings?

A.   So I worked at Kings during my drug use. My children were toddlers -- well, my daughter was a toddler, my son was about two, maybe one and a half. So I would say around 2004, 2005. It was after -- was it after? No, it was before I was raided, I believe.

Q.   When you say you were raided, what do you mean by that?

A.   Like cops kicked in my door at my residence for drug selling --

Q.   At that time --

A.   -- to support my habit. I'm sorry?

THE REPORTER: I'm sorry. I need that question again.

BY MR. GESTRICH:

Q.   At that time, were you selling drugs?

Page 24

A.   At the time I was raided?

Q.   Yes.

A.   Forced to, but yes.

Q.   What do you mean "forced to"?

A.   Well, as you know in the addict life, my husband didn't have a license and he was a big user. So being that I had a license and I had a job, I was to do his dirty work. And if I didn't, I would suffer consequences.

So in order to be able to take care of my kids and to be off sick, I would have to do that or face the consequences.

Q.   In 2009 or 2010, it's unclear from the line on your -- this sheet of paper that's on the screen, Amigos, do you recall today better than when you wrote the paper, whether your employment ended in 2009 or 2010?

A.   I'm sorry, say that one more time.

Q.   Do you see this -- do you see this line on this document Exhibit A --

A.   Yes.

Q.   -- that says Amigos, and then at the end of that same line it states 2010-maybe '09?

A.   Okay. I started school. I had my son in '08 and I started school a couple months

Page 25

after that. And I was working at Amigos while I was in school, because on the downtime, I would do my work.

So I worked there during my schooling up until they closed. I don't know what year they closed.

Q. And then you said the line Kings '09 to '11?

A. That's not right.

Q. That's not right?

A. No, sir.

Q. The next line states Applebee's?

A. Okay. I worked at Applebee's after my husband died, and he died in 2011.

Q. Do you recall what month you started at Applebee's?

A. I want to say it was -- my husband was still alive. I picture him walking in, so I want to say I started there in 2011 -- no, maybe 2010, 2011.

Q. But you don't remember which year you started there?

A. No, sir. No, sir. A lot was going on. I'm lucky I remembered everywhere I worked. Because at that point, I was working, going to

Page 26

school and taking care of grandma, grand pap, and my uncle, while raising my kids.

Q. Do you remember what month you stopped employment at Applebee's?

A. I do not.

Q. But you believe it was in 2012; is that correct?

A. I believe so.

Q. Why did your --

A. I don't remember.

Q. Why did your employment at Applebee's end?

A. My employment at Applebee's. Customer said that I wrote a tip in on a credit card slip that I did not write in. And they never asked or investigated and just terminated me.

Q. The next line says, Friday's. And it appears on the sheet that it's saying Friday's and Palazzo, and then it has two lines pointing to 2012 to 2013.

Did I ask --

A. Because I worked at those places at the -- around the same time, at the same time. I was with my new boyfriend and that's how I came up with those years. I basically tried to remember

Page 27

what was going on in my life when I was working at these places, and tried to guesstimate as best as possible.

Q. At Friday's, are you able to estimate today how long you were employed there? Was it more than a year or less than a year?

A. I want to say it was almost a year.

Q. Almost a year.
As in slightly less than a year?

A. Possibly, yes, sir.

Q. And Palazzo, do you recall how long you worked at Palazzo?

A. I only worked there for a few shifts, the vibe wasn't for me, and that's the thing with serving and bartending, if the vibe is not there for a server or a bartender, they can normally tell within a few months, and they dismiss themselves and move on.

Q. Is that why your employment at Palazzo ended?

A. I only worked a few shifts at Palazzo. The money was not great, so -- and neither were the -- some of the coworkers, and I was only there for part time, so one or two days a week. So yes, I left there.

Page 28

Q. At Palazzo, if I said that right?

A. It's not in existence anymore around here, so.

Q. No, understood. Understood.
When you say the money was not great, what was the money per hour, or per shift that you were making at Palazzo?

A. There was one shift that I worked only one shift worked that I made $300 and that was a party that was split between myself and another server. And all of the other shifts were during the day, and it was not busy, so it was maybe taking home, I don't know, maybe 50, 60 bucks if I was lucky.

Q. 50- to $60 in a shift?

A. Well, yeah but that's one shift. You know what I mean? And $2 an hour.

Q. So 50- to $60 in tips plus the $2.83 an hour?

A. Yes, that's a roundabout day for a slow lunch shift anywhere really.

Q. Now, when you say 50-to $60 per shift, how many hours are in that shift?

A. Well, it all depends, if -- so you could -- let me say this. You could make up to, I

Page 29

would say 50- or $60, if you were there for a full shift being 10:00 to 4:00 depending on how busy we were, you get cut off the floor.

So new girls normally go first. Normally -- sometimes it goes first in, first out. But when it's a hometown establishment, normally, the veterans would like to stay and make the money, so the rookies are sent home.

Q. Now, this was in 2012 to 2013, 50- to $60?

A. I believe so.

Q. And 50- to $60 per shift, I would imagine has changed to today, is that correct, in being the amount that's --

A. No, no, no, that is not correct. There are servers that could go in for a lunch shift and only make $30. There could be a server that goes in and only has two tables and she walks out with $10.

Q. Is it fair to say, given your experience at Palazzo that --

A. It was more of a nighttime dining.

Q. Okay. I'm sorry. If you could let me finish the question.

A. Sorry. I thought you were done, I'm

Page 30

sorry.

Q. No. Is it fair to say, given your experience at Palazzo, that if you're making 50- to $60 in a six-hour shift, that that is not the type of position that you would keep?

A. No, that's not what I'm saying. I'm saying, if I was scheduled more than one day a week at 50-to $60, why wouldn't I stay. That's $10 an hour, at least, and I'm not greedy.

Q. So if the shift is only one day a week, would you keep the -- are you saying that that's the reason you did not keep Palazzo is it was --

A. No.

Q. Okay. Why --

A. I'm saying, I did not keep Palazzo because the environment was not there, nor were the shifts.

Q. At the same time, around the same time you were working at Friday's, that's correct?

A. Yes, sir.

Q. Why did your employment at Friday's end?

A. I wanted to open the Olive Garden.

Q. Okay. So you quit from Friday's?

Page 31

A. I put my two-weeks in, and that day the general manager told me to just leave.

Q. At Olive Garden you said you were leaving Friday's to open Olive Garden?

A. Yes.

Q. Which Olive Garden?

A. I got wind that Olive Garden was opening.

Q. Which Olive Garden location?

A. In Washington.

Q. Do you recall around what month you started at Olive Garden? It says here on the paper, 2013?

A. I want to say it was a -- it was in November, but I don't recall if that was when training started, because there was quite a few weeks of training, or if that was when it actually opened, but I want to say it was around November.

Q. And following the 2013 on the same -- around the same line as Olive Garden on Exhibit A, it has a dash 2015. Does that mean that your employment at Olive Garden ended in 2015?

A. I believe so. As I said, these dates are not right, obviously, we established that. So I went to memory as best as I could, so

Page 32

I believe, yes, sir, that is correct.

Q. It was around 2015 then?

A. I believe so, yes, sir.

Q. Are you able to estimate the amount of months, the number of months that you worked at Olive Garden --

A. I am not.

THE REPORTER: Ma'am, I'm going to need you to wait for him to finish the question.

THE WITNESS: Sorry. I'm sorry.

BY MR. GESTRICH:

Q. Do you recall if you worked at Olive Garden for a year, closer to a year and a half, closer to two years? And that --

A. I do not.

Q. Do you remember what time of the year you stopped working at Olive Garden?

A. Winter.

Q. Would that be winter --

A. Christmas.

Q. I'm sorry, would that be winter early in 2015 or at the end of 2015?

A. I don't know.

Q. Why did your employment at Olive Garden end?

Page 33

A.    That -- so I worked a shift, it was Christmas Eve. I was scheduled, I want to say 11:00 to 7:00 in the bar area. Manager Jason, because it was Christmas Eve, and I had small children, Manager Jason Bush told me that I could go ahead and leave at 7:00 to 7:30, as I had zero tables, we weren't very busy. And as I went to do my paperwork, a manager from a different store that was covering terminated me.

Q.    Did the manager from the other store tell you why he was terminating -- he or she, why they were terminating you?

A.    She told me if I left, that there would be repercussions. And I told her, my manager told me I could leave. I had zero tables, we were not busy and Jason knew that, so I left and she didn't like that.

Q.    Looking back at Exhibit A on the line under Olive Garden it says, the word Primos, I think it says?

A.    Yes, sir.

Q.    Did you work at Primos at the same time as Olive Garden?

A.    I did.

Q.    How long did you work at Primos?

Page 34

A.    I did just work a couple months there. It was a three-server restaurant owned by an elderly couple. They were only open a few hours out of the day, they shortly closed after that.

Q.    Did your employment end because the restaurant was closing?

A.    I believe so.

Q.    The next line you use the word "Lemon Tree," do you see that?

A.    Yes.

Q.    And it says, 2015-2017. I take that to mean that you started somewhere in 2015, and ended your employment somewhere in 2017?

A.    Yes, sir.

Q.    Do you recall what month you started in Lemon Tree -- at Lemon Tree in 2015?

A.    June.

Q.    Do you recall what month you ended your employment at Lemon Tree in 2017?

A.    March.

Q.    Why did your employment at Lemon Tree end?

A.    Because she was being foreclosed on.

Q.    Okay. So do you mean that Lemon

Page 35

Tree was closing?

A.    Yes, sir.

Q.    The next line says, Country Fixins-2015-2016. Do you see that?

A.    I do.

Q.    I take that to mean that you started your employment in 2015 and ended in 2016?

A.    Yes, sir.

Q.    Do you remember what time of the year you started in 2015?

A.    I do not.

Q.    Do you recall what season of the year it was in 2015?

A.    It was chilly. It wasn't super cold, you know what I mean? And it wasn't super hot.

Q.    Did you start your employment before Lemon Tree or after you began Lemon Tree?

A.    Before.

Q.    Before. And it appears you ended your employment in 2016 at Country Fixins. Do you recall what month in 2016 you ended --

A.    I do not.

Q.    Why did your employment at Country

Page 36

Fixins end?

A.    I left. I quit.

Q.    Why did you quit?

A.    Because I chose to. The times weren't good. I was just looking for something until I found something else. I needed income and that's what you do.

Q.    The next line on Exhibit A states Bubba's Burghers-2015-2016. I take that to mean that you worked at Bubba's Burghers starting in 2015, ended in 2016?

A.    Yes, sir, around that time.

Q.    Do you recall what month in 2015 you began at Bubba's Burghers?

A.    May -- I do not. I do not.

Q.    Do you recall what the weather was like or the season was like at the time of year that you started?

A.    Cool. It was windy. It was bright. I had a coat on.

Q.    Do you recall if you were working at Bubba's Burghers before you -- I'm sorry, strike that.

Did you begin at Bubba's Burghers before Lemon Tree or after you began employment at Lemon

Page 53

A.    Yes, sir.

Q.    When she came to the Bull Pen, did you serve her drinks?

A.    I did.

Q.    Do you recall specifically whether she had a drink or not when she told you about the George Washington?

A.    When the conversation started, she did not. I am a bartender that will conversate and walk away and do what I need to do and still speak, especially in that type of environment. So we continued to have that conversation as I walked over to the draft machine, poured her beer and sat it down for her.

Q.    When Ms. Kline had drinks, what kind of drinks did she have?

A.    Yuengling or a Blue Moon.

Q.    Did she ever have any type of --

A.    No liquor.

THE REPORTER:  Wait a minute. I'm sorry.

THE WITNESS:  I'm sorry.

THE REPORTER:  You have to wait. I need the question again, "Did she ever" --

BY MR. GESTRICH:

Page 54

Q.    I asked did she ever have any hard spirits?

A.    No, sir.

Q.    How much did Ms. Kline say she made as a bartender?

A.    Per hour? She told me $14, $13.50 to $14. And in tips, she walks away with about 3- to $400 after every wedding, and that's splitting with a second bartender.

Q.    When she made those comments, did she break down for you the amount that she made in terms of her compensation and what sources she had of compensation?

A.    Can you reword the question?

Q.    Yes.

Did she say that she walks away from a wedding with -- I think you said 3- to $500; is that correct?

A.    Uh-huh.

Q.    Did she say that she walks away from a wedding with 3- to $500?

A.    3- to $400, and that's splitting with a second bartender. She showed me in her wallet.

Q.    She didn't give you a job offer

Page 55

though, right? She referred you to Caitlin; is that correct?

A.    Yes, sir.

Q.    Then you applied for the position. How did you apply for the position?

A.    Application.

Q.    Okay. What form of application did you use?

A.    It was a paper application that I did with Caitlin on Caitlin's desk the first time I met her.

Q.    When you say that, do you mean that you communicated with Caitlin and then went to the George Washington Hotel to meet with Caitlin?

A.    I mean, I went to the George Washington Hotel, asked for Caitlin. We went up to her office, had a good 25-minute conversation while I filled out the paper application, and we spoke and then she walked me down. We had the same color nail polish, and she told me she drives an hour to and from work every day in the elevator on the way down.

Q.    Do you remember about what month and year this was that you completed the application?

A.    Late July, early August of '21.

Page 56

Q.    Then did you have any subsequent conversations or messages with Caitlin after the paper application?

A.    Not -- no, I did not, not until I informed Deb that I applied and I heard nothing back.

Q.    Then who contacted you, if anyone, from the George Washington?

A.    Caitlin.

Q.    Okay. And is that the text message exchange that was produced during discovery?

A.    Yes, sir.

Q.    Did you and Caitlin have any phone conversations before -- like, throughout that text message exchange time period?

A.    I want to say that I may have spoken to her once about -- I was supposed to go up there to do paperwork, something came up. I called. I don't remember if I spoke with her or if she ended up texting me, but there were one or two times we were supposed to get the paperwork done and she got busy and something came up with my mom, I believe.

Q.    Did those conversations occur by text or by phone?

Page 57

A.    I believe I spoke with her once on the phone.  And the other, I believe, was on text.

Q.    So after you texted back and forth with Caitlin, did you set a time for you to go to the George Washington?

A.    Yes, we did.

Q.    Okay.  And when you set a time, did you have to reschedule -- about how many times did you have to reschedule?  I think you said you --

A.    Twice.

Q.    -- you rescheduled twice?

A.    Two times.

Q.    Two times.

A.    She rescheduled once and I rescheduled once.

Q.    Then after you rescheduled, you set a time for you to go to the George Washington; is that correct?

A.    Yes, sir.

Q.    And then you showed up at the George Washington; is that correct?

A.    Yes, sir.

Q.    Okay.  Do you remember what time of day you showed up at the George Washington?

A.    Maybe around 1:30, 2 o'clock p.m.

Page 58

Q.    Do you remember what time your appointment was for?

A.    A quarter after 2:00.

Q.    Okay.  Then you appeared for the -- to go to the George Washington, why were you going to the George Washington that day?

A.    I was going to the George Washington to sit down, speak with Caitlin about the job opportunity.

Q.    At that point, did you believe that you had the job?

A.    I did.

Q.    Why did you believe that you had the job?

A.    Her text message saying, we were on a hiring freeze, and we would like to bring you in to do your paperwork and get you started.

Q.    So you went to George Washington and you met with Caitlin, did she tell you that you had the job at that point?

A.    She did.

Q.    What did she say about that?

A.    She said, "Hi Jeanna.  Sorry for, you know, the gap in time.  We were on a hiring freeze, but I spoke with Deb and we'd like to get

Page 59

you paperwork done so we can get you started." And we went upstairs and did the paperwork.

Q.    What paperwork did you complete?

A.    W-2s, drug testing policy, everything.  Background, everything.

Q.    Did you believe that you were going to have to submit a -- submit to a drug test?

A.    On my way out the door, that's when she said, we do on-site drug testing.

Q.    Well, I think just a moment ago you said that you completed drug testing policy paperwork?

A.    We went through the paperwork, the very last paper was the drug testing policy.  When we got to that paperwork she said, okay.  This is a drug testing policy.  We stood up.  She said, we do our own on-site drug testing is that okay?  I stopped before I went out the door and I said, I have no problem with that.  I've been described methadone for the past ten years.  I have no problem getting paperwork from the doctor stating that I'm prescribed that.  Is that going to be an issue?  And she said, no, that should be no issue.  I said okay.  Sounds good, I'll see you Saturday.

She also told me that I would be training

Page 60

with Deb on Saturday night at 7:30.  The only thing that she did not tell me was what to wear.

Q.    Okay.  When she --

A.    She said -- I wasn't finished.  I'm sorry.  She then said, just go ahead and bring the paperwork with you, I will let Rob and the owners know that you're bringing this paperwork, and we should be all good.  See you Saturday.

Q.    Were you offered to complete the drug test while you were there?

A.    No, I was told it was an on-site drug test, and that I would be getting drug tested on Saturday.

Q.    How long have you been on methadone?

A.    Since 2008.

Q.    Have you had any relapses?

A.    No, sir.  Not on opioids.  No opioids, no Benzos, no nothing.

Q.    Why did you offer the information about the methadone?

A.    Because I know it comes up on drug screens as an opioid.  I've been in this game a long time and I know my rights.

Q.    Did you believe that you were going to fail the drug test?

Page 77

Q.    What was your position at Grande's?

A.    I was a server.

Q.    Did you do any bartending there?

A.    I did not.

Q.    Why did you end your employment at Grande's or why did it end, I should say?

A.    It ended over -- over my -- I guess, my calling 911 over the drugs I found on the back of the toilet in the women's restroom.

Q.    Tell me a little bit more about that. What happened?

A.    It was after shift, walked over into the bar area to sit down, eat, wait for my -- something, I would always go over there and sit in the bar. I got up. A girl that I actually used to work with at the Applebee's was in the restroom, it's a one-person restroom. I got up to go in, and on the back of the toilet was a big rail of cocaine.

So I came out and I went up to her and I said, hey look, you know, there's something in there on the toilet. And she was like, oh, no, that's not me. So I excused myself, I did see her go tell the other bartender, like, the bartender that was there, one of them and she went in and

Page 78

came out. I want to say it was the next day there was a drug deal going on outside of the restaurant. I called 911, because I did that the bartender came over into the restaurant part, started screaming at me profusely and went about her business.

By the time I called the owner, she was already on the phone with the owner, and the following day, I was called by the chef to tell me I was terminated.

Q.    Did the chef tell you why you were terminated?

A.    He did not. He did not. I do know that the bartender that did all of that was let go shortly thereafter over her drug use and issues there.

Q.    Is it fair to say that you've been involuntarily terminated by quite a few employers?

A.    Everybody is involuntarily terminated.

Q.    Have you made any type of EEOC claims against any other employer?

A.    No. I believe I may have made a phone call to the proper people over an exposed wire on one of the neon lights, shocking,

Page 79

electrocuting me while I was cleaning the window at Grande's, but other than that, no, sir.

Q.    Have you made any type of wage claim, either unemployment claim, or any other type of claim against Bull Pen?

A.    No.

Q.    Have you made any wage claim or other type of claim for payment for -- against Hart's Lounge?

A.    No.

Q.    And you know, we might have covered it, and I'm so sorry, it's my recollection. Why did your employment end at Bubba's Burghers?

A.    Lack of management. Lack of business, they had just opened up and it was not a good fit. It was not a good scene.

Q.    Who terminated the employment?

A.    I did.

Q.    Okay. And then a follow-up question regarding the -- when you spoke with Caitlin regarding the drug testing policy, you said that she informed you that there would be a drug test when you were leaving; is that correct?

A.    We did all of the paperwork when we got up to the conference room. The last paper in

Page 80

the employment paperwork, the last one was the drug test. As we stood up, she said we do on-site drug testing, is that going to be a problem. I said, no, ma'am. I said, I do take methadone and have been prescribed it since 2008. Would I -- would a paper from a doctor be okay and she said yeah, sure, that would be fine. I'll let Rob know. I'll let the owners know. She said and we should be okay. She said, I'll see you Saturday. I said, okay. Sounds good. You'll be with Deb at 7:30, and we'll do your drug test then. Yes, ma'am. And we walked out.

Q.    Did you speak with anybody at George Washington after that conversation?

A.    Caitlin called me.

Q.    When did Caitlin call you?

A.    A couple hours later.

Q.    Okay. What did Caitlin say?

A.    I had it on speakerphone, I was setting the table for dinner and I honestly thought she was telling me what to wear, because that's the only thing we did not cover. And instead she called and she said, Hey, Jeanna. I said, Hey, Caitlin, what's up? She said, I hate to make these -- I hate to make these types of

Page 81

phone calls. I said what do you mean? She said, unfortunately, we cannot hire you because you cannot pass a drug test with flying colors. And I said, well, what does that mean? I said, I have paperwork from my doctor that states I've been taking methadone for ten years. And she said, yeah, I'm sorry, unfortunately I went to Rob and the owners, and they both said that if you cannot pass a drug test with flying colors, that we cannot hire -- that we cannot have you work here. And I said, oh, okay. Thank you.

And she said, I'm really sorry. And I said, even if there is paperwork, and she said, yes, unfortunately they said, if you can't pass it with flying colors. And I said, okay. Well, thank you, and have a good day. And I had a shocked look on my face. My boyfriend and my daughter was there, and they heard that.

So now you may be able to see why it took me a day to start looking into other employment.

Q.   Did she say anything else on the phone call?

A.   No.

Q.   I'm going to share my screen. Do you see the document that's on the screen at the

Page 82

top it says, "Text messages"?

A.   Yes.

Q.   And at the bottom of the screen, it's a little obscured, but there's a -- what appears to be a G-o-d-w-i-n, and then there are five numbers that follow that 00002?

A.   Okay.

Q.   If I inserted an extra zero, it's just four zeros plus a two. Do you see that?

A.   I do.

MR. GESTRICH:  I'd like to mark this as Exhibit C for the record.

(Exhibit C marked for identification.)

BY MR. GESTRICH:

Q.   Do you recognize this document?

A.   I do.

Q.   Okay. What is this document?

A.   The text message that Caitlin sent me shortly after I spoke with Deb.

Q.   So I see there's first a text message, it appears to be dated Tuesday, August 3rd, at 10:33 a.m.; is that accurate?

A.   Yes.

Q.   And this was the text that she sent to you?

Page 83

A.   Yes.

Q.   Then following that, there's -- it appears that there is a little bit of duplication between the pages, and I'm going to the second page of the PDF which is at the bottom left. It says, 00003.

Do you see that?

A.   I do.

Q.   And I understand that this was in green your response to Caitlin; is that correct?

A.   Yes.

Q.   It appears that on Tuesday, August 3rd at 2:43 p.m. you said in the second paragraph, "I'd love the opportunity. Would next Monday be okay to come in for paperwork. I'm helping my mom move and we only have until Saturday to get her out of there."

Is that correct?

A.   Yes.

Q.   And then between pages two to three, it's sort of cut off, but it appears to say --be a response from Caitlin that says, "All of the managers are off on Mondays, does Wednesday, Thursday, or Friday work? It only takes 15 minutes or so."

Page 84

Is that correct?

A.   Yes.

Q.   Do you understand that to mean that she was not agreeing to meet on Monday, and she was offering you either to meet on Wednesday, Thursday, or Friday?

A.   Yes.

Q.   Okay. Then the next text message in green appears to be from you it says, "Oh, okay. Tomorrow, Wednesday?"

Did I read that correctly?

A.   Yes.

Q.   Then on the next page and this is now at the bottom of page 4 it says, 00004?

A.   Yes, sir.

Q.   It says, "Tomorrow would be fine. I can do any time the rest of this week or any time next week with the exclusion of Monday or Tuesday" -- "Monday and Tuesday."

Did I read that correctly?

A.   Yes.

Q.   The next text message is from you. It appears it says, "Okay. I'll be in Washington for an appointment tomorrow, can I stop through around 1:00-1:30, or is that your lunch"?

Page 85

First, did I read that correctly?

A.    Yes.

Q.    Okay.  Second looking at these pages, does it appear to you that these were all sent on Tuesday, August 3rd?

A.    Yes.

Q.    I'm going to scroll down.  If you need me to stop at any point --

A.    No, you're good.

Q.    -- I can stop.  Okay.

So this was on August -- Tuesday, August 3rd.  So you were discussing Wednesday, August 4th as being, quote, tomorrow; is that correct?

A.    Yes, sir.

Q.    She responds that would -- that would actually be perfect, I look forward to seeing you.  And then it appears that you respond, "Awesome.  Thanks so much."

Is that correct?

A.    Yes, sir.

Q.    Okay.  So as of these text messages on Tuesday, you had an appointment with her scheduled for 1:00 to 1:30 time frame on Wednesday, August 4th; is that correct?

Page 86

A.    Yes, sir.

Q.    There is another thread of text messages that appear at the end of page 5, and they extend to page 6.  It ends in "Wrong number.  Sorry," and it's from whoever sent these text messages.

Does that appear accurate?

A.    It does.

Q.    Then after that there is a text message that appears to be dated Wednesday, August 4th, 12:32 p.m. that states, "I just saw this, would it be possible if I could come in on Friday around 1:00 to 1:30 to do my paperwork?  I forgot I had to take my mom to the eye docs today."

Is that correct?

A.    Yes.

Q.    Is it accurate to say that, approximately, 30 minutes before the 1:00 to 1:30 time frame, you cancelled the appointment?

A.    Yes.  My appointment ran over.

Q.    So is it also fair to say that your next appointment was scheduled with Caitlin on Friday from 1:00 to 1:30?

A.    Yes, I believe so, yes.

Page 87

Q.    Then moving to -- there are a few more text messages, and on page 7, at the very top it says, "Friday, August 6th, 11:14, a.m., and then there is a text message that appears to be from you that says, "I'm sorry to keep switching things up on you.  I am short three people to help us move.  Can I please come in on Wednesday of next week?  I don't want to keep pushing this paperwork back, because I definitely want the job.  It's just I got to get my family's things out by this evening, and being short three people put me in a bad spot."  And then the text message that follows states -- from you states, "This is NOT how" -- and NOT is in all capital letters.  "NOT how I wanted my first impression to go."

Did I read those two text messages correctly?

A.    You did.

Q.    And is it accurate to say that you canceled the appointment with Caitlin a little under two hours before you were supposed to be at the George Washington to complete paperwork?

A.    Yes, sir.

Q.    Then in response at the end of page 7 it appears that there's a response that

Page 88

says, "Oh, my goodness, that's not a problem at all.  When are you able to start here?  I will be here from 7:00 to 3:00 on Wednesday.  So any time then is great.  Good luck with the move."

Did I read that correctly?

A.    Yes.

Q.    On the following page, on page 8 -- do you see this page 8 at the bottom?

A.    Yes.

Q.    There's a response that appears to be from you in green that says, "Thanks so much.  I'll come out after lunchtime."

Did I read that correctly?

A.    You did.

Q.    What time is lunchtime?

A.    Depends on where you work and what you do and when you take your lunch.

Q.    Well, this is -- in your view, when you said lunchtime here, what time did you mean?

A.    Between 12:00 and 4:00.

Q.    Then there is a response and after the response there's a new date at the end of page 8, the date at the top says, Wednesday, August 11th, 1:26 p.m.  It appears that this is a text message from you that says, "Hi, Caitlin, I

Page 89

know you're probably tired of hearing from me LOL, but I'm still at my son's doctor's appointment. He had an accident over the weekend that caused a hospital stay and we are now at the specialist's office. I didn't text earlier because our appointment was for 1:30 a.m. I am still 100 percent in on this job opportunity, I just may have to come in for paperwork" -- and then it skips to a new page, and says on the next page --

A.   Yes. Yes.

Q.   -- "come in for paperwork tomorrow, as we are waiting for him to come in now."
Did I read that text message correctly?

A.   Yes.

Q.   Okay. So in your mind, 1:26 comes after 12 o'clock p.m. after lunchtime; is that correct?

A.   Yes.

Q.   Okay. Is it fair to say that this would have been around the time that Caitlin would have been expecting you based off of --

A.   Possibly.

Q.   -- based off of the conversations?

A.   Possibly, those were the previous times but we had rescheduled for me to come in.

Page 90

We didn't cancel, we rescheduled.

Q.   Well, you canceled?

A.   We. We rescheduled.

Q.   Did she ask you to reschedule?

A.   So, she didn't but she also didn't say no.

Q.   Okay. I'm now looking at the end of page 9. There's a text message from you that appears to say, this is in all capital letters, "Not the impression that I wanted to give, as my boys are going to be the death of me. I hope you're still on board with seeing me tomorrow, as I'm really excited about this job."
Did I read that text correctly?

A.   You did.

Q.   Looking at these text messages, is it fair to say that you were very concerned about the impression you were giving with the delayed meeting times?

A.   Yes, sir.

Q.   Were you concerned that this was going to affect your ability to complete this -- to start this job?

A.   Say this one more time.

Q.   Were you concerned that the

Page 91

impressions would prevent you from getting the job?

A.   No, not concerned. I wanted to make sure that she knew my family comes first, but I was still very interested in sitting down with her and it seemed as if she was on the same page, too.

Q.   Okay. But you also said, I hope you're still on board with seeing me tomorrow"?

A.   I did. Everybody has a little bit of doubt when things like that happen.

Q.   So you did understand that there was a possibility she would not be on board with seeing you the next day; is that correct?

A.   No. No, because she did tell me that she was available Wednesdays, Thursdays, and Fridays at any time, that's how I speak and I don't like when people are upset with me for things that are out of my control.

Q.   Okay. Looking at the next page, this is page 10. It appears there is a response from the other side that says, "That's fine. Would you like to start training on Saturday night with Debbie from 3:30 to 11:00?"
Is that correct?

A.   Yes.

Page 92

Q.   Okay. Then looking at the text message, you were offered -- you were -- there was a time stated for training. Looking at the text message, did you agree to come in for that time frame, 3:30 to 11:00 on Saturday as you read the text message at the bottom, and that's in green?

A.   I did not agree to come in at 3:30.

Q.   Then in green, this is still the first green box on page 10?

A.   Uh-huh.

Q.   About halfway down, it says, "Would I be able to show around 6:30 to 7:00"; is that correct?

A.   Yes, sir.

Q.   Is it correct that Caitlin responded at the end of page 10, "That would be fine, so Saturday 7:00 to 10:30ish?"
Is that correct?

A.   Yes.

Q.   I'm going to scroll down just for a moment so that we can touch on -- okay. So the proposed period was 7:00 to 10:30; is that correct?

A.   I asked, yes, 7:00 to 10:30ish, yes.

Q.   At the end of the text message, she

Page 93

asks, and this is from the page 00010, starts on this page and ends on the next page that's 00011. And it says, "What time works for you tomorrow?" And it appears that you responded "2:00 to 2:30."

Is that correct?

A.     Yes.

Q.     Okay.  A couple text messages later, it appears there is a response from the other side that says, "2:00/2:30 is great."

Is that correct?

A.     Yes.

Q.     And at the very end of this thread at page 00012, do you see the date stamped that's on the -- right above the last text message that says --

A.     I do.

Q.     -- Thursday, August 12, 12:58 p.m.?

A.     Yes.

Q.     But your time was set for 2:00 to 2:30; is that correct?

A.     It sure was.  I let her know I was there.  I didn't go in and ask for her.  I just let her know that I was there early.  I didn't know if she was busy, I knew I would have to wait until 2 o'clock.

Page 94

However, she came out a little earlier.

MR. GESTRICH:  All right.  I do not have any further questions.  Graham?

MR. BAIRD:  I don't have any questions.  Thank you, Jeanna.  You can log off now.

THE WITNESS:  All right.  Thank you. Have a good day, guys.

THE VIDEOGRAPHER:  Counsel, can I close us out real quick?

This now concludes the videotaped deposition of Jeanna Godwin on March 7, 2023. We're now going off the record.  The time is 11:49 a.m. Eastern Standard Time.

(At 11:49 a.m., the virtual videotaped deposition concluded.)

Page 95

CERTIFICATION

I HEREBY CERTIFY that I am a Court Reporter and Notary Public.

I FURTHER CERTIFY that the witness was sworn to testify to the truth.

I FURTHER CERTIFY that the following is, to the best of my ability, a true and accurate transcription of the testimony taken stenographically by me at the time, place, and date herein before set forth.

I FURTHER CERTIFY that I am neither a relative, employee, attorney nor counsel to any of the parties to the action, and that I am neither a relative nor employee of such attorney or counsel and that I am not financially interested in the action.

_____
Court Reporter
Melissa L. Clark

(The foregoing certification of this transcript does not apply to any production of the same by any means unless under the direction, control and/or supervision of the certifying reporter.)

Page 96

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections.  You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you.  If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

EAT-N-PARK - 00-03/04 - server        $2.83/hr

Ambrogis-02-closed- server/bartender-$2.83/hr

Bob Evans (opened restaurant)-server
          04-05    $2.83/hr

PIZZA HUT- server -05 (few months) $2.83

Moose Club -05-06/07- bartender, server

Amigos - 08 until closed 2010 - maybe 09
$2.83/hr  - server, bartender
          - worked BOTH LOCATIONS

Kings- server, hostess, -09-11
$2.83/hr -worked multiple locations.

Applebees- server, hostess, bartender
__ 2.83/hr   2011-2012

Fridays \        2012-2013     server, bartender,
      & / $2.83/hr                    hostess.
Palazzo / (closed permanetley)

Olive Garden \ 2013-2015
    &                        $2.83/hr.
  Primos (closed perm)

__ Lemontree - 2015-2017- bartender $6/hr

Country Fixins -2015-2016- server $3.00/hr

Bubbas Burgers. 2015-2016- bartender
$2.83/hr                            server
__

Bullpen Rustic Inn          - head bartender
  $5.00/hr      2017-2022    server, hostess.
__

Hart's Lounge - Bartender, server
$.5.00/hr.     2022-present

EXHIBIT
tabbies
A

**Text messages**

Jeanna Godwin <jeannagodwin0317@gmail.com>

Tue 8/24/2021 12:24 PM

To: Documents <Docs@ericshore.com>

These are the text messages I have from Caitlin.





vin 00002

I'd love the opportunity. Would next Monday be ok to come in for paperwork? I'm helping my mom move and we only have

 

Text Message

      

.ıl Verizon 🛜    12:10 PM    ↗ 100% 🔋



C

caitlin >

Tue, Aug 3, 2:43 PM

Hi Caitlin, my speaker isn't working properly so I can't hear to fix my voicemail lol.

I'd love the opportunity. Would next Monday be ok to come in for paperwork? I'm helping my mom move and we only have until Saturday to get her outta there.

in 00003

All of the managers are off on

mondays, does wednesday, Thursday, or friday work? It only takes 15 minutes or so.

> Oh okay! Tomorrow Wednesday??

Tomorrow would be fine! I can do anytime the rest of this week. Or anytime next week

 

      





caitlin >

Tomorrow would be fine! I can do anytime the rest of this week. Or anytime next week with the exclusion of monday and Tuesday.

Ok. I'll be in Washington for an appointment tomorrow, Can I stop through around 1-130 or is that your lunch?

That would actually be perfect. I look forward to seeing you!

Awesome!! Thanks so much

Wed, Aug 4, 11:29 AM

Can you please start setting tables?? The bride is coming in tomorrow morning and wants the tables set.

  Text Message

   Pay

.ıl Verizon 🛜          12:11 PM          ◁ 100% 🔋



caitlin ›

in 00005

The number of people at each

table is the red number written
in the middle of the tables on
the seating chart

Wrong number! Sorry!

Wed, Aug 4, 12:32 PM

😆 I just saw this!  Would it be possible if I could come in on Friday around 1-130 to do my paperwork. I forgot I had to take my mom to the eye docs today.

Thats totally fine!

Thanks so much! I'll see you then!

Sounds good!

Fri, Aug 6, 11:14 AM

Text Message











vin 00006

.ıl Verizon 🛜  12:11 PM  🔋 100% 🔋





caitlin >

Fri, Aug 6, 11:14 AM

I'm sorry to keep switching things up on you. I am short 3 people to help us move... can I please come In on Wednesday of next week. I don't want to keep pushing this paperwork back because I definitely want the job; it's just I gotta get my family's things out by this evening, and being short 3 people put me in a bad spot

This is NOT how I wanted my first impression to go.

Oh my goodness, thats not a problem at all! When are you able to start here? I will be here from 7-3 on wednesday. So anytime then is great! Good luck with the move!

win 00007

  

Text Message

  Pay

 Verizon  12:11 PM  100%

< 2


C

caitlin >

Thanks so much. I'll
Come out after lunch time!!

I promise you are fine! Its a
busy week here so Wednesday
would be great. Sounds good,
see you then!

Wed, Aug 11, 1:26 PM

Hi Caitlin... i know you're
probably tired of hearing from
me, lol, but im still at my sons
doctors appt, he had an
accident over the weekend, that
caused a hospital stay and we
are now at the specialists

vin 00008

office.

I ddnt text earlier because our appt was for 1130am. I am still 100% in, on this job opportunity, I just may have to come in for paperwork

Text Message

        

## UNKNOWN NAME

Haddonfield, NJ

 



caitlin >

come in for paperwork tomorrow, as we are waiting for him to come in now.

This is NOT the first impression I wanted to give, as my boys are going to be the death of Me…. I hope you're still on board with seeing me tomorrow, as Im really excited about this job.

in 00009

Thats fine! Would you like to start training on saturday night with Debbie from 3:30-11?

I'd love too, but my mom works until 6 and I'm unable to leave min alone, because he can't walk and has staples in his head... would I be able to show around 630-7?? I'd like that very much, if that's ok with you. I'll have my ID an SS card on me

Text Message

        

 Verizon  12:21 PM  97%



caitlin >

That would be fine! So saturday 7-10:30ish. I can't even imagine. Paperwork tomorrow, please bring the SS and ID/ drivers license. What time

vin 00010

works for you tomorrow.

2-230??

Awesome!! Thanks so much!! Quick question… are there certain days and times we come in to set up for an event?

For bartending or general set up?

2/2:30 is great

Well the bartending, I guess, lol.

I can also ask you tomorrow, I'm sure your busy… I'm still waiting for the doctor lol

Text Message

 

  **Pay



Verizon    12:21 PM    97%

 1     C

vin 00011

**caitlin**

Well the bartending, I guess, lol.

I can also ask you tomorrow, I'm sure your busy... I'm still waiting for the doctor lol

I think they usually come in on Thursday to get it ready for Saturday weddings, but friday would work too.

Oh ok!! Sounds awesome!!! I'm sure I'll think of more questions tomorrow lol.

Thanks so much! See ya tomorrow at 2-230!!

Sounds good, see you then!

Thu, Aug 12, 12:58 PM

I'm here now, if that's ok.

 

vin 00012



Godwin 00013

# EXHIBIT 5

Applicable pages of Transcript of Deposition of Timothy Paris, as Corporate Designee of Bull Pen Rustic Inn, LLC.



# Planet Depos®
We Make It *Happen*™

# Transcript of Timothy Paris, Corporate Designee

**Date:** March 8, 2023
**Case:** Godwin -v- The George Washington, LP

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

Transcript of Timothy Paris, Corporate Designee
Conducted on March 8, 2023

1 (1 to 4)

## 1

IN THE UNITED STATES DISTRICT COURT FOR THE

WESTERN DISTRICT OF PENNSYLVANIA

- - - - - - - - - - - - - -x

JEANNA GODWIN,                :

     Plaintiff,        : Case No.:

                : 2:22-cv-01066-PLD

-v-                          :

THE GEORGE WASHINGTON,       :

LP,                          :

     Defendant.        :

- - - - - - - - - - - - - -x

Deposition of BULL PEN RUSTIC INN, LLC,

by and through its Corporate Designee,

TIMOTHY PARIS

CONDUCTED VIRTUALLY

Wednesday, March 8, 2023

9:32 a.m.

Job No.: 483621

Pages: 1 - 71

Reported By: Brooklyn E. Schweitzer, RPR, CRR

## 2

Telephonic Deposition of TIMOTHY PARIS, conducted virtually.

*** ALL PARTIES ATTENDED REMOTELY. ***

Pursuant to Notice, before Brooklyn E. Schweitzer, Registered Professional Reporter, Certified Realtime Reporter, and Notary Public in and for the Commonwealth of Pennsylvania.

## 3

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:

    GRAHAM BAIRD, ESQUIRE

    LAW OFFICE OF ERIC A. SHORE

    1500 John F. Kennedy Boulevard

    Suite 1240

    Philadelphia, PA 19102

ON BEHALF OF THE DEFENDANT:

    ANTHONY T. GESTRICH, ESQUIRE

    WHITEFORD TAYLOR & PRESTON, LLP

    11 Stanwix Street

    Suite 1400

    Pittsburgh, PA 15222

## 4

C O N T E N T S

| EXAMINATION | PAGE |
|---|---|
| By Mr. Gestrich | 5 |
| By Mr. Baird | 63 |
| By Mr. Gestrich | 67 |

E X H I B I T S

| EXHIBIT | | PAGE |
|---|---|---|
| Exhibit 1 | Subpoena | 11 |
| Exhibit 2 | Employment Termination Form | 26 |
| Exhibit 3 | 2062 Bull Pen Rustic Inn, LLC Payroll Journal - Detailed | 53 |

Transcript of Timothy Paris, Corporate Designee    12 (45 to 48)
Conducted on March 8, 2023

that somebody ran out of room on Ms. Godwin's employee folder to write notes; is that correct?

A That's what I would say.

Q And it appears they had to add an additional paper to write down notes on Ms. Godwin's file; is that correct?

A Yes. Can you scroll down a little bit? I want to see if that's an envelope, or -- yes. So they added -- she added a second piece of paper. Sometimes if there's an envelope, like, with a resignation letter or something like that in it or something, she will -- she will put notes on that as well, but that's just an additional piece of paper that was added to the file, correct.

Q First, as a general question, is it normal for somebody at Bull Pen to have this much writing regarding report-offs, call-offs, no-shows in their employee file in this time frame?

A I have employees that have nothing on their file, and I have employees that could have this much or more on their file depending on -- ten years ago, no. It's not normal. This day and age, there's a lot of -- there is a lot of employees that have some issues, and with trying to find employees and staff,

normally me as an owner would not ever let this get this far along, but with this day and age and trying to find help and staff and that, you've kind of got to watch what you do to cut your nose off, spite your face, for lack of better words.

But we have employees that will have nothing on their file when they are done with me, and we'll have employees that will have this much or more. So I can't say. Is it normal? No, it's not good to have this much stuff if you're an employee, and it's not good for me as an owner to let someone have this much stuff, but in this industry, we're kind of handcuffed.

Q Okay. So, in other words, if I understand you correctly, Bull Pen is very accommodating at this time with these types of issues?

A We're very accommodating from -- since the day I bought it. Yes, we are very accommodating, and a lot of people don't like that about me, but, again, everybody deserves a shot.

Q Okay. At the bottom of this writing on this paper, on Page 22 of the PDF, there's a line that starts with walk out, and then it says 9/23/22.

Do you see that on your screen?

A Yes.

Q Do you have any knowledge about why this is on this document?

A Yes.

Q What does this mean?

A By that date there, that was one of the times where I had told my manager, I said, these girls have got to quit closing so early at night. I said there was a -- I believe it was possibly a football game or something. I'm not 100 percent sure, but there was something where I had been getting phone calls from people that I know that says, hey, we went out to get something at the bar afterwards, and it was closed. That was going on a few times.

I think this day here, my manager had confronted Jeanna about it and said, hey, Jeanna, we've got to quit closing the bar early. We've got to quit picking up the chairs around everybody and mopping up and everything. You know, when there's customers here, they're customers. We've got to wait to do our closing duties.

Jeanna got very irate, and was yelling and screaming while we was there open, and apparently had walked out. One of the other employees at the

time who was a fairly new hire, but her and Jeanna had seemed to get along, had called me and said, hey, Tim, Jeanna's very mad; she just left; blah, blah, blah. I said okay.

And then my manager called me and said, hey, Jeanna walked out. I told her about closing early, doing this, doing that, she got very mad at me, and said she left and said she quit.

And then shortly after that, Jeanna had called me and apologized, and, you know, basically said it -- you know, she was wrong, she shouldn't have got mad, she shouldn't have yelled and screamed in front of everybody. She shouldn't have got mad at the manager. She should have never walked out. She apologized and wanted to know if she could get her job back.

I said, Jeanna, I need to think about it, and one of the reasons I needed to think about it is because of all of that information you asked me on your folder that we keep documentation of. I said, let me think about it. I'm not 100 percent sure that I'm going to be able to bring you back, especially since she disrespected my manager, and I didn't tell Jeanna this, but since she disrespected my manager and she disrespected a few

other employees, it would have created a bad scenario to bring her back and put her back into the workforce.

Q Okay. This incident, it happened on 9/23/22. When you say that she was irate and screaming, did this occur in front of customers?

A My understanding is it occurred in front of customers and other employees. I was not on the premises at the time.

Q When the manager -- I'm sorry, what was the manager's name?

A Caroline.

Q What's her last name?

A Staffileno.

Q I'm actually going to scroll to the bottom of the document. It's on -- there we -- yeah, there we go.

Do you see on Page 19 of the PDF her name -- there's a name printed at the bottom, Caroline Staffileno?

A Yes.

Q And I'm going to -- I'm going to zoom in on this for the benefit of our court reporter who's going to have to type her name out. It appears that it states on here her last name's spelled S-T-A-F-F-I-L-E-N-O. Is that how you spell her last name?

A Yes.

Q Thank you. When Ms. Staffileno confronted Ms. Godwin regarding closing early and cleaning up around customers, do you know if she confront her because Ms. Godwin was indeed closing early and cleaning up around customers?

A She confronted her because I told her to confront her about it because I actually heard it from patrons and customers, and I've actually viewed it on the cameras that we have at the bar.

Q So you personally observed through the cameras Ms. Godwin closing up early when she was not permitted to close up early?

A When I would say -- yes, I've seen her close early and start to wrap up and do her end-of-the-day duties while customers were still in the bar or at the tables. When you say not permitted to close up, like I said, we're kind of loose-ended on that end of it as far as the bartender's discretion of when to close, but it's definitely known we don't close when there's customers in the bar.

Q Okay. So there -- there are -- is it fair

to say that when customers are not in the bar, it's left to the bartender's discretion whether to close?

A Yes, as long as it's somewhat after 11:00, midnight area, yes, it's their discretion. But anything at 10:00, 10:30, quarter to 11:00, we don't -- that's not -- it's kind of known verbally that we don't close that early.

Q Okay. And was it known to Ms. Godwin that she was not permitted to close the bar when customers were in the bar between, let's say, after 11:00 and until 2:00?

A Yes.

Q Okay. What times do you recall -- do you recall what time Ms. Godwin was closing the bar early?

A Well, I know one of the times, I know it was, like, a quarter after 10:00, 10:30, I observed it. Honestly, no, I do not document all the times that -- I check on all my employees with my -- I live 1,000 yards from the Bull Pen, so I periodically go on the cameras in the evenings just to make sure everything's right, there's no one in there that looks a little off or shady or whatever, and if I click on it around 10:00, 10:30, and we're closed, I know we closed early. So I don't document it. I just basically tell my manager, hey, tell so-and-so to quit closing early, or hey, closed a little early last night, let's not do that.

Q Okay. When Ms. Godwin walked out that night --

A That was a morning.

Q That was a morning?

A That was the beginning of her shift, that morning.

Q Okay. When she left, did she ask at any time afterwards to continue working at the Bull Pen?

A Yes.

Q Was she permitted to work at the Bull Pen?

A No.

Q Is it fair to say that Ms. Godwin was involuntarily terminated due to her walk-out?

A She quit. She walked out and said "I quit."

Q She said "I quit" on the spot?

A That's my understanding, that she walked out, she said, that's it, I can't take it no more; I'm done; I quit.

# EXHIBIT 6

Applicable pages of Transcript of Deposition of Gena Hartman, as Corporate Designee of Hart's Restaurant and Lounge, Inc.



**Planet Depos**
We Make It *Happen*™

# Transcript of Gena Hartman

**Date:** March 8, 2023
**Case:** Godwin -v- The George Washington, LP

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

## Page 1

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

- - - - - - - - - - - - - -x

JEANNA GODWIN,               :

        Plaintiff,      : Case No.:

                        : 2:22-cv-01066-PLD

-v-                          :

THE GEORGE WASHINGTON,    :

LP,

        Defendant.

- - - - - - - - - - - - - -x

Videotaped Deposition of GENA HARTMAN

CONDUCTED VIRTUALLY

Wednesday, March 8, 2023

1:39 p.m.

Job No.: 482549

Pages: 1 - 74

Reported By: Brooklyn E. Schweitzer, RPR, CRR

## Page 2

Videotaped Deposition of GENA HARTMAN, conducted virtually.

\*\*\* ALL PARTIES ATTENDED REMOTELY. \*\*\*

Pursuant to Notice, before Brooklyn E. Schweitzer, Registered Professional Reporter, Certified Realtime Reporter, and Notary Public in and for the Commonwealth of Pennsylvania.

## Page 3

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:

    GRAHAM BAIRD, ESQUIRE

    LAW OFFICE OF ERIC A. SHORE

    1500 John F. Kennedy Boulevard

    Philadelphia, PA 19102


ON BEHALF OF THE DEFENDANT:

    ANTHONY T. GESTRICH, ESQUIRE

    WHITEFORD TAYLOR & PRESTON, LLP

    11 Stanwix Street

    Suite 1400

    Pittsburgh, PA 15222


Also Present:    Isaiah Sheridan, Videographer

## Page 4

C O N T E N T S

| EXAMINATION | PAGE |
|---|---|
| By Mr. Gestrich | 6 |
| By Mr. Baird | 64 |

E X H I B I T S

| EXHIBIT | | PAGE |
|---|---|---|
| Exhibit 1 | Subpoena | 11 |
| Exhibit 2 | Application | 17 |
| Exhibit 3 | October 2022 Schedule | 24 |
| Exhibit 4 | November 2022 Schedule | 24 |
| Exhibit 5 | December 2022 Schedule | 31 |
| Exhibit 6 | Text Messages | 61 |
| Exhibit 7 | Pay Stub | 63 |

Exhibit 4.

(Exhibit 4 was marked for identification and is attached to the transcript.)

Q I have another document on the screen. You see a new document on the screen?

A Yes, sir.

Q And this document at the top right corner says December 2022; is that correct?

A Yes, sir.

Q What is this document?

A That was intended to be the December 2022 bar schedule.

Q At the bottom of this schedule, there is a No. 30; is that correct? Do you see that?

A Yes.

Q Okay. And the first name that's at the top is Gena, which I understand to be your name; is that correct?

A Yes, sir.

Q And the bottom is Jeanna, and that is referring to Ms. Godwin; is that correct?

A Yes, sir.

Q Did you work that day, do you remember?

A Yes, sir.

Q Okay. Why does that day -- is that day memorable for some reason?

A Absolutely.

Q Okay. Why is that day memorable?

A I worked the daylight shift. After work, I got off at 7:00. I didn't end up leaving until 8:30 p.m. I was just doing some, like, administrative things, and because Jeanna Godwin didn't work a whole lot of nights, making sure that she was comfortable.

So I left at 8:30. I came home. I did home life things. I went to bed around 10:00 p.m. Right around 11:00 is when I started getting text messages, and Ms. Godwin, she -- and I think I sent you the text message where she -- she said that she was leaving. And I called her and I asked her what's going on. I had fallen asleep, so I was kind of, I guess, lethargic. You know, confused on what was going on.

So she -- I called her. She said that the bar customers were bullying her. And I said, just hang on. Hang on. I'm on my way, and I didn't put on undergarments. I threw on a hoodie and sweatpants and thought I was just going to go diffuse the situation and see, you know, what was happening.

And when I walked in, she went and grabbed her purse and any tips that were in her bucket, and she turned and walked out without a word and left. So I was stuck bartending the rest of the night with no bra or underwear on, just sweats. That's why it was a memorable night.

Q Did she give you any indication when you were coming in that she was going to leave?

A She gave me the indication before I even left my house that she was going to leave. She had sent me a text that said I'm leaving, and I called her, and in the service industry, it's very easy to get an overwhelmed feeling, so I was trying to calm her down and tell her everything was okay, and, you know, they're just bar people, and, you know, I trusted her judgment, and if she had to shut someone off or -- you know, she had training. She's certified.

So she was just beyond -- I couldn't talk her down into calming down, so I said I'm on my way. So that's when I drove up there, but I really thought that I was just going to tell her to relax, everything's okay, and see if the customers were truly giving her a hard time or if maybe she was overreacting, and she left.

Q Is it fair to say that you did not think you were going to have to complete the shift that night?

A Yes, it's very fair to say that.

Q Was this the first time that Ms. Godwin did this?

A Abandoned the shift?

Q Yes.

A Yes.

Q Prior to this night, were there any issues with Ms. Godwin closing the restaurant early?

A Not that -- no.

Q Prior to this night, were there any issues with Ms. Godwin coming to work on time for her shifts?

A She had a tendency to run late pretty often. She did notify me by text message, but it was pretty often, and being the only server/bartender that we have -- we only usually have one at a time, it's fairly important to be timely.

Q Is that because if she is running late, that means the prior employee has to stay for her?

A Yes, the prior employee has to stay, or if she was on a daylight and she was running late, we

wouldn't open on time.

Q Okay. So let's focus, then, for a second on the daylight shifts. Was she late for the daylight shifts sometimes?

A Yes.

Q How late? I mean, are we talking five minutes late? An hour late?

A I don't recall her ever being more than 15 minutes late, but I will say I think it was always with notification.

Q Did Ms. Godwin ever call off the shifts -- a shift?

A Yes.

Q About how many shifts do you think she called off?

A I think she called off six or seven shifts.

Q Just to make sure I understand the context, you said six or seven shifts within the October to December time frame?

A Yes.

Q Okay. Did that cause problems for Hart's Restaurant?

A I mean, we work with limited staffing, so if someone called off, we don't have a giant pool of people to pull from to cover that shift. So there were a few instances where it was difficult, but we never had to close a day or not, you know, operate because of it.

Q So is it safe to say or fair to say that there were instances where other employees had to cover shifts for her with little notice?

A Absolutely.

Q Were you one of those people that had to cover shifts?

A Yes, sir.

Q As the person that had to cover the shifts -- and I understand -- this is not a question directed at Hart's Restaurant. This is a question directed at you. Did this cause problems for you where she would call off a shift with little notice?

A I think -- you know, when your plans have to change, of course; however, that's also the nature of my job there. So it's kind of a wash. You know, I get paid for it. You can always use an extra shift before Christmas.

Q Understood, understood.

Okay. I am going to take that document off the screen that we marked as Exhibit 5.

(Exhibit 5 was marked for identification and is attached to the transcript.)

Q I'm going to put a new document on the screen. You know what? Strike that.

What happened after Ms. Godwin left that night in terms of her employment at Hart's Restaurant?

A So that night she abandoned the shift, that was a Friday. The following Thursday -- and I don't have the dates because I'm not looking at anything, but -- so six days later, she texted me when she showed up for what would be her next regular shift, and I think I sent that text in the documents as well. And she said, Ms. Fran, who is the owner's mother, she's just always there, said that Kelly was working.

So what -- in general what happened was Jeanna showed up for her next scheduled shift thinking she was still going to be employed after abandoning her shift and never reaching out in six days to -- to explain or maybe to try to, you know, make it right or just have a discussion at all. Just showed up there six days later like she still worked there, and I hadn't heard from her in six days, so I took it as she quit.

Q Did she ask to continue to work at Hart's Restaurant?

A Yes.

Q Apart from her text message?

A Not apart from her message. We only spoke via text.

Q Okay. Is there a reason you only spoke with text -- over text with her?

A I think that it gives a lot of opportunity to think before you speak. I also didn't -- I didn't have a lot of respect for someone who walked out on their shift, so I didn't really want to hear excuses, and I am a very big person on proof. Just because I was afraid maybe she would try to file unemployment, and I know my owners were afraid of that, or that something would be misconstrued. So via text is always the way I like to do anything with scheduling. So --

Q When you say that there was a concern about her filing for unemployment or something along those lines, was that specific to Ms. Godwin, or was that -- is there a different concern?

A No. Just in general, the owners like to be sure that, you know, we have proof of anything

33

and that no one would file unemployment when they had the opportunity that they could have worked.

Q Was Ms. --

A It wasn't specific to her.

Q Okay. Understood. Thank you for the clarification.

With Ms. Godwin, she, I think -- as I understand it, she had an intention of continuing to work there, but it was Hart's position that she would no longer work there; is that accurate?

A Yes. Yes.

Q Is it fair to characterize Hart's view of her termination as termination for employee misconduct?

A Yes.

Q Did you have any -- or did Hart's have any concerns regarding Ms. Godwin's professionalism at the time that she was employed?

A Not that I -- not that I can recall specifically.

MR. BAIRD: I didn't hear that one. I apologize. The Zoom is getting garbled.

MR. GESTRICH: The question or the answer?

MR. BAIRD: The answer I did not hear at all.

34

MR. GESTRICH: Okay.

MR. BAIRD: Yeah.

THE WITNESS: I don't think -- I don't --

MR. GESTRICH: I'm so sorry. Here, let me step in just for a second. Can we have the court reporter read back the answer?

(Requested portion of testimony was read back by the court reporter.)

MR. BAIRD: Okay.

BY MR. GESTRICH:

Q Ms. Godwin, was there anything additional to your answer that was not caught by Zoom?

A No, sir.

Q Could you characterize Ms. Godwin's termination from Hart's as an issue with professionalism?

A I don't think that I understand what you're asking. Can you reword that to me, please?

Q In your viewpoint -- well, Hart's Restaurant's viewpoint, was Ms. Godwin's actions the night that she abandoned her shift, were those unprofessional actions?

A Yes. 100 percent, that is not tolerated by myself or by either of the owners. So that's -- there was no really chance to fix that

35

on the table, although I did leave the door open to reach out, you know, the next day. It does get very overwhelming and I'm very understanding of that.

Q I'm going to share my screen again. Are you able to see a document on your screen that's being shared on this Zoom?

A Yes, sir.

Q Okay. At the top of the document, for my screen, the very top in the left corner, it says 5:55, and it has in the middle of the top of the document the name Jeanna, and under it, it says Friday, October 14th, at 7:55 a.m.

Do you see that?

A Yes, sir.

Q I'm going to zoom out. This is a 24-page document. Now, I will explain to you what we did with this. We received the text messages, the pictures that were sent and uploaded into the OneDrive link that was sent to you. There were 24 files, and they were combined into one document.

So I'm just going to scroll through this document. Do you recognize what these -- what these pictures are pictures of generally?

A Yes, sir. And can I clarify that the time

36

up on the top left, that's the time that I screenshotted, not the time that those came in. I just wanted to make sure that, you know, I was telling you.

Q Yes. Yes, ma'am. Understood. Are these screenshots from your cell phone?

A Yes, sir.

Q And who is Jeanna on the top of this text message screenshot?

A That's Jeanna Godwin.

Q And you communicated with Ms. Godwin on this device that you screenshotted from?

A Yes.

Q Okay. Now, I'll explain to you what we're going to do, and I'll explain sort of how we did it, okay, and then I'm going to ask you to identify things about this.

The pictures that you sent on OneDrive, we put them into one document, and we tried to arrange them in accordance from the time that you pointed out that was the time of the screenshots, that 5:55 a.m. on the top left corner, and we try to put them in sequential order.

Now, sort of like a puzzle, we tried to piece them together. We'll walk through those.