IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JEANNA GODWIN | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 22-1066 |
| | ) | |
| THE GEORGE WASHINGTON, LP, | ) | Magistrate Judge Dodge |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Plaintiff Jeanna Godwin ("Godwin") alleges that she was subjected to discrimination on the basis of a disability or perceived disability when an offer of employment was withdrawn by Defendant The George Washington, LP ("the GW") in violation of the Americans With Disabilities Act, 42 U.S.C. §§ 12101-12117 (ADA).

Presently pending before the Court is Defendant's motion for summary judgment (ECF No. 37). For the reasons that follow, the motion will be granted in part and denied in part.[1]

### I. Relevant Procedural Background

Godwin commenced this action in July 2022 and filed an Amended Complaint on October 3, 2022 (ECF No. 11). Count I of the Amended Complaint alleged disability discrimination in violation of the ADA and Count II asserted the same allegations under the Pennsylvania Human Relations Act, 43 P.S. §§ 951-63 (PHRA). Federal question jurisdiction was asserted over the ADA claim, 28 U.S.C. § 1331, and supplemental jurisdiction was asserted over the state law claim, 28 U.S.C. § 1367(a).

On October 17, 2022, Defendant filed a partial motion to dismiss (ECF No. 13) the

---

[1] The parties have fully consented to jurisdiction by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (ECF No. 19.)

Amended Complaint, seeking dismissal both with respect to the request for punitive damages in Count I and the PHRA claim in Count II, the latter on the ground that it was premature. Defendant filed an Answer to the other allegations in the Amended Complaint (ECF No. 15).

During the initial case management conference that was held on November 15, 2022, the parties reached a compromise in which Godwin agreed to file a Second Amended Complaint ("SAC"), at which time the PHRA claim would be timely, and Defendant's pending motion to dismiss would be considered only if the SAC still included a request for punitive damages.

On December 2, 2022, Godwin filed the SAC, which still included a request for punitive damages. Although the SAC mentions the PHRA in its opening paragraphs, it does not include a PHRA claim. On December 30, 2022, the Court filed an opinion (ECF No. 30) and order (ECF No. 31) denying the partial motion to dismiss the request for punitive damages. In its opinion, the Court noted the fact that the SAC does not contain a claim under the PHRA (ECF No. 30 at 2 n.2). No amendment of the SAC was sought thereafter.

On April 24, 2023, Defendant filed a motion for summary judgment (ECF No. 37), which has been fully briefed (ECF Nos. 39, 41, 44).

II. **Factual Background**

The GW operates a hotel and event venue in Washington, Pennsylvania. During the period between August 2020 and August 2021, the GW consistently employed a total of less than 101 employees, including full-time employees, part-time employees, and seasonal workers. (Defendant's Concise Statement of Material Facts ("DCSMF") ¶¶ 1-2) (ECF No. 38.)

Godwin has an opioid addiction. In 2008, she was prescribed methadone to treat her addiction and has been taking methadone daily since that time. (*Id.* ¶ 11.) She notes that she has never had a relapse since she began the methadone maintenance program. (Plaintiff's Opposition

to the Defendant's Statement of Material Facts ("PODSMF") ¶ 11) (ECF No. 42.)

Godwin has held almost two dozen bartending and serving positions in the last two decades, averaging "a couple months to a few years" in each position. She has been involuntarily terminated from several of these positions. (DCSMF ¶¶ 12-13.)[2]

According to the GW, its hiring process begins when an applicant submits a resume either online through Indeed.com or in-person at the front desk. After an application is received, the hiring manager in the relevant department reaches out to the applicant to schedule an initial interview. Based on the result of the initial interview, the hiring manager chooses whether they want to proceed with the applicant. If so, the applicant is invited back to complete the necessary paperwork and a background check is completed. Once the paperwork and background check have been completed, the applicant returns for a final interview with the GW's general manager, Robert Plutto. The final stage of the hiring process is a drug test, which every employee is required to take and pass prior to beginning their employment. (*Id.* ¶¶ 15-20.)

The GW's banquet manager, Caitlin Hutchison, is the initial contact for prospective positions in the banquet department. Godwin applied to the GW for the position of banquet bartender through Indeed.com in or around summer 2021. The GW states that, at that time, there were several other applicants for the banquet bartender position, all of whom were interviewed by Hutchison and none of whom were ultimately hired for the position. Godwin participated in two interviews at the GW, the first of which occurred in or around July 2021, and the second of which occurred on or about August 3, 2021. According to Hutchison, Godwin used "foul language" during her first interview and arrived dressed in "jeans and a tank top," which

---

[2] Although Defendant notes that Godwin has also been terminated from two positions since the time she applied to work for the GW (*id.* ¶ 14), the Court concludes that this is not material to the disposition of Defendant's motion.

Hutchison deemed to be "unprofessional." Nevertheless, Hutchison invited Godwin back for a second interview, during which Hutchison and Godwin reviewed the GW's drug testing policy, and Godwin disclosed that she was prescribed methadone. (DCSMF ¶¶ 21-26.)[3]

Godwin denies that the interview process described by GW is what took place. (PODSMF ¶¶ 17-20.) In addition, she disputes GW's description of her interaction with Hutchison. Godwin denies using foul language or dressing inappropriately. Rather, she states that she met with Hutchison for twenty-five minutes during which she completed an application.[4] Nothing further happened until Godwin told Deborah Kline, a friend who worked as a bartender at the GW who had suggested she apply for the position, that she had not heard anything about her application. Godwin then received texts from Hutchison stating that she "was on a hiring freeze but I would love to bring you in for paperwork and give you a starting date if would still like to work with us."[5] At that point, Godwin believed she had been hired by the GW and Hutchison told her that she had the job. Godwin had not met with Plutto at this point. (PODSMF ¶¶ 22, 24-25.)

Godwin described the discussion with Hutchison about drug testing as follows:

> A. We went through the paperwork, the very last paper was the drug testing policy. When we got to that paperwork she said, okay. This is a drug testing policy. We stood up. She said, we do our own on-site drug testing is that okay? I stopped before I went out the door and I said, I have no problem with that. I've been described [sic] methadone for the past ten years. I have no problem getting paperwork from the doctor stating that I'm prescribed that. Is that going to be an issue? And she said, no, that should be no issue. I said okay. Sounds good, I'll see you Saturday.
>
> She also told me that I would be training with Deb on Saturday night at

---

[3] Hutchison concedes that she has a hard time distinguishing between the first and second interviews, and that it is possible some of the events described as occurring during the first interview actually occurred during the second interview. (DCSMF ¶ 29.)
[4] While Godwin refers to her as "Caitlyn Hutchinson," the record is undisputed that the correct spelling is "Caitlin Hutchison." See ECF No. 40, Ex. 1 at 5:6-8.
[5] These text messages are included in the record. See ECF No. 40 Ex. C.

> 7:30. The only thing that she did not tell me was what to wear.
>
> . . .
>
> A. She then said, just go ahead and bring the paperwork with you, I will let Rob and the owners know that you're bringing this paperwork, and we should be all good. See you Saturday.
>
> Q. Were you offered to complete the drug test while you were there?
>
> A. No, I was told it was an on-site drug test, and that I would be getting drug tested on Saturday.

(PODSMF ¶ 26.)

The parties dispute a number of other facts. As it relates to the drug test, the GW states that Godwin declined to take a drug test because she was not comfortable doing so, and Hutchison told her that due to their policy, they could not move forward without a drug test. According to the GW, Hutchison relayed to Plutto following the second interview that Godwin was not comfortable taking a drug test, and Plutto responded that a drug test was required for all employees. (DCSMF ¶¶ 27-28.)[6]

Godwin disputes the GW's version of these events. She represents that she agreed to take a drug test and present paperwork from her doctors regarding her methadone maintenance program. Several hours later, Hutchison called her and according to Godwin:

> A. I had it on speakerphone, I was setting the table for dinner and I honestly thought she was telling me what to wear, because that's the only thing we did not cover. And instead she called and she said, Hey, Jeanna. I said, Hey, Caitlin, what's up? She said, I hate to make these -- I hate to make these types of phone calls. I said what do you mean? She said, unfortunately, we cannot hire you because you cannot pass a drug test with flying colors. And I said, well, what does that mean? I said, I have paperwork from my doctor that states I've been

---

[6] The GW further states that, even if Godwin had passed a drug test, Hutchison would not have recommended that the GW hire her "due to her lack of professionalism." (DCSMF ¶ 30.) Notably, the GW did not tell Godwin that it was the reason she was not hired for the position. The statement is also at odds with Hutchison's testimony that, despite Godwin's alleged lack of professionalism, Hutchison invited her back for a second interview. Moreover, as noted above, Godwin disputes Hutchison's statements that she dressed unprofessionally and used foul language. See Godwin Aff. ¶¶ 2-3, ECF No. 42 Ex. D.

>taking methadone for ten years. And she said, yeah, I'm sorry, unfortunately I went to Rob and the owners, and they both said that if you cannot pass a drug test with flying colors, that we cannot hire -- that we cannot have you work here. And I said, oh, okay. Thank you.
>
>And she said, I'm really sorry. And I said, even if there is paperwork, and she said, yes, unfortunately they said, if you can't pass it with flying colors. And I said, okay. Well, thank you, and have a good day. And I had a shocked look on my face. My boyfriend and my daughter was there, and they heard that.

(PODSMF ¶ 27.) The GW acknowledges Godwin's description of what occurred (DCSMF ¶¶ 39-43), although it rephrases what Hutchison said as the GW "would be unable to hire her unless she took and passed a drug test." (DCSMF ¶ 44.) Godwin responds that this fails to accurately characterize her testimony, which is quoted above. (PODSMF ¶ 44.)

According to the GW, general manager Robert Plutto is the ultimate decisionmaker in the hiring process, and every applicant must participate in a final interview with Plutto prior to being hired. Godwin visited the GW twice to interview for the banquet bartender position. The first visit was for the purpose of an initial interview with Hutchison, the banquet manager. The purpose of the second meeting was to complete her final interview, to fill out new hire paperwork, and to take her drug test. After Godwin's second interview, Hutchison came to Plutto's office and explained that Plaintiff had a preexisting medical condition for which she was prescribed methadone. Plutto responded that "like all staff, she must take a drug test." Godwin never met with Plutto and ultimately, she was not hired. (DCSMF ¶¶ 31-35.)

Again, the parties materially differ on these events. According to Godwin, Hutchison offered her a position, apparently without consulting with Plutto, and the purpose of the second meeting was to complete paperwork and obtain a start date. She never refused to take a drug test. Moreover, Plutto testified that he was listening to Godwin and Hutchison discuss the position and he never heard Godwin refuse to take a drug test. Rather, he simply believed that her

6

employment never made it to that point. (PODSMF ¶¶ 31-35.)

The purpose of the GW drug policy is the safety of the hotel, staff, and clientele. There is particular importance to having bartenders drug tested because they service customers, their work involves knife skills, and there are concerns related to overserving and DUIs. It contends that it has a long history of hiring recovering addicts, including individuals currently taking methadone. These individuals "all followed the process and took their drug test," and methadone was not a bar to hiring for any of these employees. (DCSMF ¶¶ 36-38.)[7]

### III. Standard of Review

The Federal Rules of Civil Procedure provide that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court of Appeals has held that "where the movant bears the

---

[7] Godwin denies these statements as "conclusions of law to which no response is required." (PODSMF ¶¶ 36-38.) However, they are not conclusions of law and thus they are deemed admitted. See LCvR 56(E). Their relevance is discussed later in this opinion.

burden of proof at trial and the motion does not establish the absence of a genuine factual issue, the district court should deny summary judgment even if no opposing evidentiary matter is presented." *National State Bank v. Federal Reserve Bank*, 979 F.2d 1579, 1582 (3d Cir. 1992).

In following this directive, a court must take the facts in the light most favorable to the non-moving party, and must draw all reasonable inferences and resolve all doubts in that party's favor. *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 266 (3d Cir. 2005); *Doe v. County of Centre, Pa.*, 242 F.3d 437, 446 (3d Cir. 2001).

**IV.   Analysis**

      A.   ADA Claim

Pursuant to the provisions of Title I of the ADA: "No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

The term "disability" is defined as:

(A) a physical or mental impairment that substantially limits one or more major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(1).

In the absence of direct evidence of discrimination, a plaintiff may establish a prima facie case of discrimination indirectly following the shifting burden analysis set forth by the Supreme Court in the Title VII case of *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973). *See Lawrence v. National Westminster Bank N.J.*, 98 F.3d 61, 68-69 (3d Cir. 1996) (applying

8

analysis to ADA claim).

In order to state a state a prima facie case in a failure to hire scenario, a plaintiff must:

> establish that (1) he belongs to a protected category; (2) he applied for and was qualified for a job for which the employer was seeking applicants; (3) despite his qualifications, he was rejected; and (4) after his rejection, the position remained open and the employer continued to seek applicants.

*Olson v. General Elec. Astrospace*, 101 F.3d 947, 951 (3d Cir. 1996) (citations omitted).

The GW does not dispute that Godwin has stated a prima facie case, and in fact, she has done so. She belongs to a protected class, applied for and was qualified for the position and was rejected. According to the GW, several other applicants were interviewed for the position.

The burden of production then shifts to the GW to articulate a legitimate, non-discriminatory reason for its action. It has proffered as its legitimate, non-discriminatory reason for not hiring Godwin the fact that she refused to take a drug test.[8] Thus, the GW has satisfied its relatively light burden of production. *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 500-01 (3d Cir. 1997). The burden then shifts back to Godwin to proffer evidence from which the trier of fact could conclude that this proffered reason for not hiring her is a pretext for unlawful disability discrimination.

As the Court of Appeals has explained:

> to defeat summary judgment when the defendant answers the plaintiff's prima facie case with legitimate, non-discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely

---

[8] The GW also argues that it did not hire Godwin because she "showed up in unprofessional attire" and used "profane language" during the interview and claims that its "concerns regarding Plaintiff's professionalism and decision not to hire have been validated by Plaintiff's job history and the fact that [she] has been fired from the two jobs she has had since interviewing with Defendant." (ECF No. 39 at 8-9.) As explained above, Godwin disputes the characterizations of her conduct and attire during the interview, and her job history subsequent to the events at issue is not relevant. *See Ramos v. Walmart, Inc.*, 2023 WL 2327208, at *5 (D.N.J. Mar. 2, 2023) (quashing subpoenas sent to other employers for whom the plaintiff worked as irrelevant to the issues in the case).

9

than not a motivating or determinative cause of the employer's action. *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994) (citations omitted). The employer's proffered reason cannot be a "post hoc fabrication." *Id.*

Refusing to hire someone on the basis of a disability or a perceived disability violates the ADA. Although individuals who are currently using illegal drugs are not covered by the Act, 42 U.S.C. § 12210(a), this exclusion does not apply to those who are recovering from drug addiction by, for example, taking methadone as legally prescribed by their physicians. § 12210(b). *See also* 42 U.S.C. § 12111(6)(A) (the term "illegal use of drugs" "does not include the use of a drug taken under supervision by a licensed health care professional.") *See Equal Emp. Opportunity Comm'n v. Hussey Copper Ltd.*, 696 F. Supp. 2d 505, 516 & n.16 (W.D. Pa. 2010) (employee who was taking methadone had "a record of disability and/or was regarded as disabled.")

Thus, an employer who has a blanket policy of requiring all applicants to take a drug test and then rejecting those who tested positive for methadone, would, in the absence of any further inquiry, violate the ADA. *See MX Group, Inc. v. City of Covington*, 293 F.3d 326, 339 (6th Cir. 2002) ("we cannot agree with Defendants, that in the context of a drug addiction impairment, merely because methadone has the intended effect of ameliorating the addiction, recovering drug addicts lose all protection under the ADA. The statute itself belies any such contention."); *Hussey Copper Ltd.*, 696 F. Supp. 2d at 520 (W.D. Pa. 2010) (employer's failure to engage in an individualized asssesment of the effect of applicant's use of methadone on his suitability for a labor job because he posed "a high probability of substantial harm to himself" created genuine issue of material fact precluding summary judgment in employer's favor); *Equal Emp. Opportunity Comm'n v. Steel Painters LLC*, 433 F. Supp. 3d 989, 1007 (E.D. Tex. 2020) (EEOC stated a prima facie case of discrimination against employer, in part, based on statement by

administrative manager that "we don't normally hire people on methadone.")

On the other hand, the EEOC takes the position that: "It is not a violation of the ADA for employers to use drug tests to find out if applicants or employees are currently illegally using drugs. Tests for illegal use of drugs are not subject to the ADA's restrictions on medical examinations. Employers may hold illegal users of drugs and alcoholics to the same performance and conduct standards as other employees."[9]

Godwin proceeds along "*Fuentes* prong one" by arguing that she has submitted evidence from which a factfinder could reasonably disbelieve the GW's articulated legitimate reason. *Keller v. ORIX Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997) (en banc). She also proceeds along "*Fuentes* prong two" by arguing that she has proffered evidence that "allows the fact finder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Keller*, 130 F.3d at 1111. The test is "disjunctive" and either prong is sufficient; all of the evidence must be considered as a whole. *Snooks v. Duquesne Light Co.*, 314 F. App'x 499, 505 (3d Cir. 2009).

The GW argues that the reason it did not hire Godwin is that she refused to take a drug test, which it requires of all applicants for bartending jobs. However, Godwin testified that she did not refuse to take a drug test; rather, she contends that hours after she revealed the fact that she was on a methadone maintenance program, her offer of employment was withdrawn. Thus, Godwin has produced evidence from which a factfinder could reasonably disbelieve the GW's articulated legitimate reason. Further, this evidence could lead a fact finder to conclude that discrimination was more likely a motivating factor in not hiring her.

Clearly, the parties tell two different versions of Godwin's efforts to seek employment

---

[9] https://www.eeoc.gov/laws/guidance/technical-assistance-manual-employment-provisions-title-i-americans-disabilities-act (visited July 27, 2023).

with the GW. These disputed facts are material to a resolution of their dispute. Simply put, there are genuine issues of material fact, as outlined above, about whether the GW discriminated against Godwin by withdrawing an offer of employment after it learned she was on a methadone maintenance program, or whether it did not hire her because she refused to take a mandatory drug test and therefore, it did not violate the ADA.

Finally, the GW also points to its proffered evidence, which Godwin has not disputed, that it has hired other employees who are taking methadone. (DCSMF ¶ 38.) Presumably, it raises this point to suggest that, if it hired other employees who are taking methadone, it could not possibly have refused to hire Godwin for this reason. The trier of fact certainly may consider this evidence and conclude that it is more likely than not that the GW did not refuse to hire Godwin because of her methadone use. However, on summary judgment the Court cannot draw all of the inferences in favor of the GW and conclude that this fact resolves the matter. *See, e.g., Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 321 (3d Cir. 2000) ("an employer does not have to discriminate against all members of a class to illegally discriminate against a given member of that class.")

The Court cannot resolve genuine issues of material facts or make credibility determinations on a motion for summary judgment. As the Supreme Court has indicated, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150 (2000). The court must disregard all evidence favorable to the moving party that the jury is not required to believe. *Id.* at 151.

Therefore, in this respect, the GW's motion for summary judgment will be denied.

B. <u>Punitive Damages</u>

A plaintiff may recover punitive damages if she "demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). The Supreme Court has held that "the terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 535 (1999). Further, these terms require that "an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law." *Id.* at 535-36.

The GW argues that Godwin does not offer any facts that it had knowledge that it "may be acting in violation of federal law." In turn, Godwin asserts that upon learning of her past addiction and methadone maintenance program, the GW rescinded an offer of employment, which demonstrated purposeful, intentional conduct. She notes that the conflict in the testimony between Hutchison and Plutto—Hutchison contends that she told Plutto that Godwin refused to take a drug test, but Plutto denied ever hearing that—suggests that the GW is struggling to "get its story straight" and that it apprehended the risk that terminating the hiring process under these circumstances would violate her rights.

Again, the disputed facts and conflicting testimony preclude the GW from obtaining summary judgment with respect to this issue. *See Lugo v. Walmart, Inc.*, 616 F. Supp. 3d 451, 462 (E.D. Pa. 2022) (motion for summary judgment on punitive damages denied when the plaintiff produced evidence suggesting that Walmart was aware of her disability and had granted her an accommodation, but failed to honor it and when she testified about supervisor's comments about her disability, which could also be considered by a jury as evidence of malice or reckless

indifference); *Donnelly v. Capital Vision Servs., LLC*, 2022 WL 17486361, at *10 (E.D. Pa. Dec. 6, 2022) (when evidence relating to behavior supporting punitive damages was disputed, court stated that it would be "more prudent to defer ruling until the record is developed at trial.")

Godwin has testified that she notified the GW that the methadone she was taking was prescribed by her physician and offered to provide certification, and the GW responded by withdrawing its offer of employment. Although the GW disputes her version of events, the Court must accept Godwin's description as true for purposes of the pending motion for summary judgment. If the trier of fact believes Godwin's evidence, this could support the recovery of punitive damages because the GW's actions may have been made with knowledge that it was violating the law. *See Johnson v. Federal Express Corp.*, 996 F. Supp. 2d 302, 322 (M.D. Pa. 2014) ("Determining an employer's intent or knowledge for its employment actions is a task best relegated to the factfinder."), *aff'd*, 604 F. App'x 183 (3d Cir. 2015). On the other hand, if Godwin fails to elicit sufficient evidence at trial to support a punitive damages award, the GW may request appropriate relief at trial.

Therefore, as it relates to Godwin's request for punitive damages, the GW's motion for summary judgment will be denied.

### C. Damages Cap

Finally, the GW argues that even if Godwin prevails in this action, her damages are limited by statute to $50,000.00 because it employed fewer than 101 employees. See 42 U.S.C. § 1981a(b)(3)(A) (limiting the amount of compensatory and punitive damages "in the case of a respondent who has more than 14 and fewer than 101 employees in each of 20 or more calendar weeks in the current or preceding calendar year [to] $50,000.") This includes part-time and temporary workers. *See Faush v. Tuesday Morning, Inc.*, 808 F.3d 208, 218-19 (3d Cir. 2015)

(finding that temporary workers are classified as "employees" for Title VII purposes). "The 'cap' applies to both punitive and compensatory damages." *Gagliardo v. Connaught Labs., Inc.*, 311 F.3d 565, 570 (3d Cir. 2002).

Godwin does not dispute this analysis or the fact that the GW had fewer than 101 employees. (PODSMF ¶ 2; ECF No. 41 at 12.) Rather, she contends that she may recover damages under the PHRA, which does not have this cap on damages. *See Gagliardo*, 311 F.3d at 572 ("§ 1981a does not prohibit apportionment of damages between claims, one under a capped federal statute and another under a corresponding uncapped state statute, so that the verdict winner gets the maximum amount of the jury award that is legally available.")

As a review of the SAC readily confirms, however, the SAC does not assert a claim under the PHRA. While a PHRA claim was included in the amended complaint, it was not pleaded in the subsequently filed SAC.[10] An amended complaint supersedes the pleading it modifies and the original complaint "no longer performs any function in the case." *Saint-Jean v. Palisades Interstate Park Comm'n*, 49 F.4th 830, 835 (3d Cir. 2022). *See Kopko v. Lehigh Valley Health Network*, 776 F. App'x 768, 774 (3d Cir. 2019) (plaintiff abandoned PHRA claim by failing to put it in her in amended complaint).

Simply put, Godwin's recovery is limited to the $50,000 cap under the ADA. Therefore, the GW's motion for summary judgment will be granted as to this issue.

---

[10] As discussed previously, the Court's opinion that resolved the GW's motion to dismiss referenced the fact that the SAC did not include a claim under the PHRA. No amendment of the SAC was sought thereafter.

## V. Conclusion

For these reasons, the GW's motion for summary judgment (ECF No. 37) will be granted in part and denied in part.

An appropriate order follows.

Dated: August 23, 2023

BY THE COURT:

/s/Patricia L. Dodge
PATRICIA L. DODGE
United States Magistrate Judge